**PEOPLE Acting Through Community Effort by James FORD et al.**

**v.**

**Joseph A. DOORLEY, Jr., Mayor, City of Providence, et al.**

**Civ. A. No. 4779.**

United States District Court,
D. Rhode Island.

Feb. 10, 1972.

Stephen J. Fortunato, Jr., of Breslin, Sweeney, Reilly & McDonald, R. I. Affiliate-American Civil Liberties Union, Warwick, R. I., David M. Levy, R. I. Legal Services, Inc., Providence, R. I., for plaintiffs.

Robert J. McOsker, City Sol. for Providence and Ronald H. Glantz, Deputy City Sol. for Providence, Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

This is an action for a declaratory judgment pursuant to 28 U.S.C. §§ 2201, 2202 and Fed.R.Civ.P. 57 seeking a declaration of invalidity of an Ordinance of the City of Providence, Section 2 of the Ordinance No. 461, Chapter 1971–55 as amended by Ordinance No. 462, Chapter 1971–56 (Oct. 21, 1971), as violative of the First and Fourteenth Amendments of the United States Constitution.[1] Jurisdiction is founded on 28 U.S.C. § 1343(3) (4). The challenged ordinance proscribes, with certain exceptions, picketing of residences.

## FINDINGS OF FACTS

On or about November 16, 1971 in Providence, the plaintiff, Reverend James Ford, together with the seven other named plaintiffs went to the residence of one Abraham Konoff. They picketed in front of this home by walking in single file about 6–8 feet apart carrying signs reading, "Mr. Konoff fix your property on Dudley Street," with others having pictures of the Dudley Street property showing what they termed violations of the housing code.

---

1. The plaintiffs fail to note that the questioned Ordinance was further amended on November 21, 1971, Section 2, Chapter 1971–72. Since the section in controversy was not changed or modified, in the interest of accuracy, the plaintiffs may amend their pleadings accordingly. Section 2 reads:

"SECTION 2. *Residential Picketing.*

(1) Declaration. It is hereby declared that the protection and preservation of the home is the keystone of democratic government; that the public health and welfare and the good order of the community require that members of the community enjoy in their homes and dwellings a feeling of well-being, tranquility, and privacy, and when absent from their homes and dwellings, carry with them the sense of security inherent in the assurance that they may return to the enjoyment of their homes and dwellings; that the practice of picketing before or about residences and dwellings causes emotional disturbance and distress to the occupants; obstructs and interferes with the free use of public sidewalks and public ways of travel; that such practice has as its object the harassing of such occupants; and without resort to such practice full opportunity exists, and under the terms and provisions of this ordinance will continue to exist for the exercise of freedom of speech and other constitutional rights; and that the provisions hereinafter enacted are necessary for the public interest to avoid the detrimental results herein set forth.

(2) It shall be unlawful for any person to engage in picketing before or about the residence or dwelling of any individual. Nothing herein shall be deemed to prohibit (1) picketing in any lawful manner during a labor dispute of the place of employment, involved in such labor dispute, or (2) the holding of a meeting or assembly on any premises commonly used for the discussion of subjects of general public interest. SECTION 3. This Ordinance shall take effect upon its passage."

The defendant, Sergeant Inglesby, of the Providence Police Department approached the demonstrators and informed them that they were in violation of the anti-residential picketing ordinance and ordered they disperse. For fear of being arrested and prosecuted, the plaintiffs left the scene and now seek vindication in this Court.

This Court finds, and all parties agree, the demonstration was peaceful and orderly. It is also beyond dispute, and all parties agree, that during said demonstration some of the plaintiffs were distributing leaflets and other material within or around the residence owned by Mr. Konoff and this particular activity was not interferred with or infringed upon by the officer.

People Acting Through Community Effort (PACE) was described as " . . . an organization designed to help neighborhood groups of people within the City of Providence to organize and to devise solutions to community problems. One of [their] primary goals has been to remedy the problem of housing violations existing throughout the City by meeting with the landlords responsible for the violations." (Affidavit of James F. Ford)

Prior to the picketing, plaintiff, Reverend Ford, President of and spokesman for PACE, informed the press it was going to take place. He also testified that when picketing, he has in mind a general audience of city officials and the general public.

## CONCLUSIONS OF LAW

■ At the outset the Court recognizes the settled precedent placing a heavy burden on the plaintiffs in their attack on the ordinance in question. The presumption of constitutionality attached to Acts of Congress is axiomatic and needs little discussion. It is logical to extend such principle and find that this law, though not of Congressional dignity, is nevertheless within the penumbra of constitutional presumption.

Any doubts about the standing of these plaintiffs raised by Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and its companion case Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971) have been resolved by the opinion of Judge Coffin for the First Circuit Court of Appeals in Wulp v. Corcoran, 454 F.2d 826 (Jan. 11, 1972).

■ Like plaintiffs in *Wulp*, and unlike plaintiffs in *Younger* and *Boyle*, plaintiffs here have actually been prevented by defendants or their agents from residential picketing and have been threatened with arrest if they continue to picket. None of these plaintiffs have been arrested for violation of the ordinance, nor are there any pending prosecutions against them. They allege facial unconstitutionality through overbreadth, and, under *Wulp*, have standing to pursue this action. There is, subsequently, no occasion to decide when irreparable injury must be alleged or to discuss the current vitality of the "chilling effect" doctrine, see The Supreme Court, 1970 Term, 85 Harv.L.Rev. 301 et seq. (1970).

The plaintiffs argue that the central question is whether the ordinance is so substantially overbroad as to be susceptible of impermissible application thus prohibiting constitutionally protected freedom of speech. The overbreadth doctrine they espouse argues invalidity for lack of legislative articulation of accommodation of interests of free expression and privacy. However, they fail to recognize the validity of the argument that residential picketing should not be allowed at all.[2]

■ The question presented is one of the accommodation of the interests of free expression and of privacy. Plaintiffs assert they engaged in a classic form of expression under the First Amendment—peaceful picketing on a public sidewalk. The ordinance at issue prohibits such picketing and reflects the legislative judgment that residential picketing is meant to harass and cause

2. See T. Emerson, The System of Freedom of Expression 559 (1970).

emotional distress, thus destroying the tranquility and privacy of the home.[3] The dimensions of this conflict were seen by one commentator as follows:

> "It may be historically true, as Justice Roberts suggested in Hague v. CIO, [307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423] that time out of mind streets and public places have been used for purposes of assembly and exchange of thought and opinion. But it is also true that time out of mind the home has been man's sanctuary, the shelter of his family, the repository of his memories, and the center of his hopes . . ."

Kamin, Residential Picketing and the First Amendment, 61 Nw. U.L.Rev. 177, 226 (1966)

I hold that the challenged ordinance, as drawn, is justified by the interest in protection of privacy and is not invalid under the First Amendment.

■ The precise Constitutional origins of the right of privacy, like those of the "fundamental right of travel," Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600, are difficult to locate. The "right of privacy" describes a variety of interests[4] and is a complex conceptualization whose facets reflect the First, Third, Fourth, Fifth, Ninth, and Fourteenth Amendments. Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). The Third Amendment prohibits the quartering of soldiers in any house in time of peace without the owner's consent. The Fourth Amendment protects "[t]he right to privacy, no less important than any other right carefully and particularly reserved to the people . . ." a right "basic to a free society." Mapp v. Ohio, 367 U.S. 643, 656, 81 S.Ct. 1684, 1692,

6 L.Ed.2d 1081 (1961). The Fourth and Fifth Amendments protect against "invasions . . . of the sanctity of a man's home and the privacies of life." Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886).

As Mr. Justice Goldberg noted, the Due Process Clause of the Fourteenth Amendment "protects those liberties that are 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " Griswold, supra, 381 U.S. at 487, 85 S.Ct. at 1683 (J. Goldberg, concurring). And I agree with him that "the right of privacy is a fundamental personal right, emanating 'from the totality of the constitutional scheme under which we live.' " Id. at 494, 85 S.Ct. at 1687.

■■ In attempting to preserve the right of privacy in the home, the challenged ordinance seeks to protect a fundamental and highly fungible right. The power of the State and its municipalities to protect its citizenry against invasions of privacy is indisputable. See, e. g. Dietemann v. Time, Inc., 449 F.2d 245 (9th Cir. Aug. 23, 1971). The power of the state to protect the right of privacy against a First Amendment claim does not, I feel, demand that the right of privacy be located in a particular Constitutional provision. It is sufficient that the ordinance expresses the state's strong and well defined interest in protecting so important a right. As Griswold said, in finding a constitutional right to marital privacy:

> "We deal with a right of privacy older than the Bill of Rights—older than our political parties, older than our school system."

381 U.S. at 486, 85 S.Ct. at 1682.

3. The "Declaration" portion of the challenged ordinance articulates the legislative intent behind the ordinance. See footnote 1, *supra*, for the text. Cf. Board of Education of Central School Dist. No. 1 v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) ; School District of Abington Township v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).

4. For part of the growing commentary on the "right of privacy," see Gross, The Concept of Privacy, 42 N.Y.U.L.Rev. 34 (1967) ; Bloustein, Privacy As An Aspect of Human Dignity: An Answer to Dean Prosser, 39 N.Y.U.L.Rev. 962 (1964) ; Prosser, Privacy, 48 Calif.L.Rev. 383 (1962). For the seminal work in this area, see Warren and Brandeis, The Right to Privacy, 4 Harv.L.Rev. 193 (1890).

The United States Supreme Court has repeatedly accepted privacy as a significant or determinative factor, as an interest to be balanced, in the fashioning of decisions about regulation of free speech. See, e. g., Gregory v. Chicago, 394 U.S. 111, 118–120, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969) (J. Black, concurring.)

Just as First Amendment interests may be protected as well as threatened by governmental power, see Comment, 85 Harv.L.Rev. 689, 692 at n. 15 (1972), the right of privacy of the individual may find its protection in the exercise of governmental power.

In Martin v. City of Struthers, 319 U. S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943) the Supreme Court struck down an ordinance, not directed solely at commercial advertising, which prohibited ringing door bells or otherwise summoning residents to the door for the purpose of receiving handbills, circulars or other advertising matter. In doing so it said:

> "In considering legislation which thus limits the dissemination of knowledge, we must 'be astute to examine the effect of the challenged legislation' and must 'weigh the circumstances and . . . appraise the substantiality of the reasons advanced in support of the regulations.' "

319 U.S. at 144, 63 S.Ct. at 863.

It then reasoned:

> "The dangers of distribution can so easily be controlled by traditional legal methods, leaving to each householder the full right to decide whether he will receive strangers as visitors . . ."

Id. at 147, 63 S.Ct. at 865.

It pointed out that the homeowner had an adequate protection mechanism by the implementation of an appropriate sign "that he is unwilling to be disturbed." There are no such simple and adequate protective mechanisms to protect the individual whose home is being picketed.

The protection afforded expression of First Amendment rights should not be thought to be so rigid as to exclude respect for the needs of privacy of the individual. Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), which protected the right of laborers to picket, stated:

> "The power and the duty of the State to take adequate steps to preserve the peace and to protect the privacy, the lives, and the property of its residents cannot be doubted. But no clear and present danger of destruction of life or property, or invasion of the right of privacy, or breach of peace can be thought to be inherent in the activities of every person who approaches the premises of an employer and publicizes the facts of a labor dispute involving the latter. We are not now concerned with picketing en masse or otherwise conducted which might occasion such imminent and aggravated danger to these interests as to justify a statute narrowly drawn to cover the precise situation giving rise to the danger."

310 U.S. at 105, 60 S.Ct. at 745.

It is a more than reasonable legislative judgment that the proscribed residential picketing is inherently a serious invasion of the right of privacy.

In part, the "right of privacy" protects against nuisances such as raucous noises. In Kovacs v. Cooper (1949), 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513, holding constitutional an ordinance prohibiting the use on a public street of a sound truck emitting loud and raucous noises, the Court said:

> "The constitutionality of the challenged ordinance as violative of appellant's right of free speech does not depend upon so narrow an issue as to whether its provisions are cast in the words of prohibition or regulation. The question is whether or not there is a real abridgment of the rights of free speech.

> Of course, even the fundamental rights of the Bill of Rights are not absolute. The Saia case recognized that in this field by stating 'The hours and place of public discussion can be controlled.' It was said decades ago in

an opinion of this Court delivered by Mr. Justice Holmes, Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470, that:

'The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic. It does not even protect a man from an injunction against uttering words that may have all the effect of force.'

Hecklers may be expelled from assemblies and religious worship may not be disturbed by those anxious to preach a doctrine of atheism. The right to speak one's mind would often be an empty privilege in a place and at a time beyond the protecting hand of the guardians of public order.

. . . The unwilling listener [of a sound truck's noise] is not like the passer-by who may be offered a pamphlet in the street but cannot be made to take it. *In his home or on the street he is practically helpless to escape this interference with his privacy by loud speakers except through the protection of the municipality.*" (emphasis added)

336 U.S. at 85–87, 69 S.Ct. at 452.

It is my opinion there is no significant resultant difference between picketing and raucous loud speaker noises. In both situations, the privacy of the trapped homeowner is invaded and both may be regulated. More important than protection against nuisances is the "right to be left alone" encompassed in the right of privacy. This right to be left alone is crucial where the individual is helpless to respond, a captive of those invading his privacy.

The homeowner of a picketed residence and his or her family are a captive audience, whose freedom not to listen is severely circumscribed by the picketers. Admittedly, such is an objective of residential picketing. But this objective is constitutionally suspect. Rejecting a claim by bus passengers that the public utilities commission in allowing the bus company to install radios that played

ninety percent music and ten percent commercials had violated their Fifth Amendment right to privacy, the Supreme Court noted:

"This position wrongly assumes that the Fifth Amendment secures to each passenger on a public vehicle . . . a right of privacy substantially equal to the privacy to which he is entitled in his own home."

Public Utilities Commission v. Pollock, 343 U.S. 451, 464, 72 S.Ct. 813, 821, 96 L.Ed. 1068 (1952)

The captive homeowner has not chosen to submit himself to an environment where there is an ongoing broadcast of messages or to a majority's preference to listen to those messages. See Black, He Cannot Choose But Hear: The Plight of the Captive Auditor, 53 Col.L.Rev. 960, 964–65.

## OVERBREADTH

■ As to overbreadth, I find little merit to the plaintiffs' position because the ordinance simply is not a regulation on general picketing. On the contrary its prohibitory parameters are clearly "residential[ly]" circumscribed unless the residence is a place of employment or commonly of public assembly. No bar exists to the many available alternatives, mentioned infra, for the airing of grievances. The ordinance, by its own terms does not apply to a residence "commonly used for discussions of general public interest" where a meeting is being held.

Plaintiffs' claim is insufficient to void a law of such limited application:

". . . a law ought not to be struck down for overbreadth unless it lends itself to a substantial number of impermissible applications. A substantial overbreadth rule is implicit in the chilling effect rationale. While it is true that even the most carefully drawn statutes may have some chilling effect on privileged activity and that especially cautious persons may prefer to remain at several removes from a prohibited zone, still the presumption must be that only substantial over-

broad laws set up the kind and degree of chill that is judicially cognizable."

The Overbreadth Doctrine, 83 Harv.L. Rev. 859, 884.

I do not find such substantial overbreadth, nor do I find a "chill" of such magnitude as to mandate a finding of invalidity.[5]

I would note that other means of expression are available. As argued, some of these are parades, motorcades, passing of handbills, or door to door solicitation. See Organization for a Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971). If the grievance is of lack of enforcement of a law, there is the right to peacefully demonstrate in view of the public office building of the public enforcement official.[6]

It is my opinion that *residential* picketing is not a conventional means for the exercise of First Amendment rights. On the contrary, it is an instrument of harassment and oppression pregnant with "physical intimidation and coercion." Residential Picketing, 61 Nw.L.Rev. at 231 (1966–1967). I find this undemocratic and violative of constitutional protection belonging to all citizens—innocent or otherwise.

Further, it is too late in the history of demonstrations, marches, picketing, and other forms of expression for this ordinance to be found unconstitutionally vague. Plaintiffs were, as reasonable persons would be, knowledgeable of what activities were proscribed.[7]

## EQUAL PROTECTION

■ The plaintiffs also argue denial of equal protection because, as they contend, picketing during labor disputes is exempted. They claim it is a penalizing classification not required by any compelling governmental interest. Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600.

I do not agree. The short answer is that such exemption is necessary so as not to deny an employee the right of picketing at the subject matter of his dispute. Absent this exemption the plaintiffs could then rightfully urge its unconstitutionality.

The home is protected unless it is a place of employment—if so, the occupants involved in the employer-employee relationship have no cause to complain. The subject matter of the dispute is then

---

5. The plaintiffs cite Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) in support of their overbreadth argument. I do not find such comfort in the case.

Cox involved disturbing the peace, obstructing public passages and picketing before a court house.

Focusing on the picketing case, the statute prohibits pickets or parades in or near a state court house. The conviction was overturned not because of a declaration of unconstitutionality of the statute but rather it rested on consent being given to the demonstrators by the police officials.

It is interesting to note that Mr. Justice Black in his dissent stated, " . . . and I do not believe that this statute is unconstitutional either on its face or as applied."

6. See Comment, Picketing the Homes of Public Officials, 34 U.Chi.L.Rev. 106, 140 (1966):

" . . . one whose home is frequently beset by residential picketers, is the slumlord, who often actively seeks anonymity. While exposure of such lesser-known people may be welcome, and often efficacious, residential picketing remains a questionable tactic. At least in the case of unwarranted housing practices, protests directed to the proper municipal agencies and enforcement and improvement of present housing codes, appear to be proper solutions."

7. In passing, I would note that the Providence ordinance is an almost verbatim copy of Rev. Laws Hawaii §§ 300–1, 300–2, which were cited by commentators as excellent models of constitutionally permissible prohibitions on "residential picketing." See Kamin, Residential Picketing and the First Amendment, 61 Nw.U. L.Rev. 177, 206–207; Comment, 34 U. Chi.L.Rev. 106, *supra.*

involved and the situs then becomes fair game.[8]

## CONCLUSION

I find no constitutionally valid reason, in this case, to permit the invasion of man's last citadel of refuge. The sanctity of the home must carry great weight in the balance of rights if we are to avoid a procrustean precedent insensible to family structure.[9]

It is hereby *Ordered* that the Ordinance of the City of Providence, Section

8. Carpenters and Joiners Union of America, Local No. 213 v. Ritter's Cafe, 315 U.S. 722, 727, 62 S.Ct. 807, 810, 86 L.Ed. 1143 (1942).

   "In picketing the retail establishments the union members would only be following the subject matter of their dispute."

9. "Petition for redress of grievances are communication directed to the place of government in person, by mail, by telephone or even by demonstration in view of public office buildings. *Having utilized such methods, when a group resorts to residential picketing, it introduces a note of physical intimidation and coercion which is as foreign to our notion of proper public decision-making* as bribery, blackmail or overt physical coercion. If public decisions are to be made in this way, the group which can bring the greatest amount of physical power to bear upon officials will see its views prevail. A government somewhere might function in this way—but it would not be a democracy."

   "I, of course, do not mean to say or even to intimate that freedom of speech, press, assembly, or petition, can be abridged so long as the First Amendment remains unchanged in our Constitution. *But to say that the First Amendment grants those broad rights free from any exercise of governmental power to regulate conduct as distinguished from speech,* press, assembly or petition, would subject all the people of the Nation to the uncontrollable whim and arrogance of speakers, and writers, and protesters, and grievance bearers. As Mr. Justice Goldberg wrote for the Court in Cox v. Louisiana, 379 U.S. 536, 554, 13 L.Ed.2d 471, 484, 85 S.Ct. 453 (1965) :

   'The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy.'

   "Were the authority of government so trifling as to permit any one with a complaint to have the vast power to do anything he pleased, wherever he pleased, and whenever he pleased, our customs and our habits of conduct, social, political, economic, ethical, and religious, would all be wiped out, and become no more than relics of a gone but not forgotten past. Churches would be compelled to welcome into their buildings invaders who came but to scoff and jeer; streets and highways and public buildings would cease to be available for the purposes for which they were constructed and dedicated whenever demonstrators and picketers wanted to use them for their own purposes, *and perhaps worse than all other changes, homes, the sacred retreat to which families repair for their privacy and their daily way of living, would have to have their doors thrown open to all who desired to convert the occupants to new views, new morals, and a new way of life.* Men and women who hold public office would be compelled, simply because they did hold public office, to lose the comforts and privacy of an *unpicketed* home. I believe that our Constitution, written for the ages, to endure except as changed in the manner it provides, did not create a government with such monumental weaknesses. Speech and press are, of course, to be free, so that public matters can be discussed with impunity. *But picketing and demonstrating can be regulated like other conduct of men. I believe that the homes of men, sometimes the last citadel of the tired, the weary, and the sick, can be protected by government from noisy, marching, tramping, threatening picketers and demonstrators bent on filling the minds of men, women, and children with fears of the unknown.*" (Emphasis added) Kamin, Residential Picketing and the First Amendment, 61 Nw.U.L.Rev. 177, 231.

   The courts have held that the home is a man's castle no matter how humble and in the case of State v. Cooper, 205 Minn.

2, Chapter 1971–72 (November 21, 1971) is hereby declared constitutional and not in violation of the First and Fourteenth Amendments to the Constitution of the United States.

333, 285 N.W. 903 (1939) the court stated that:

"  .  .  . 'the home is a sacred place for people to go and be quiet and at rest and not be bothered with the turmoil of industry,' and that as such it is 'a sanctuary of the individual and should not be interfered with by industrial disputes  .  .  .' "