Sandra C. SCHULTZ and Robert C. Braun, Plaintiffs-Appellees,

v.

Russell FRISBY, George R. Hunt, Robert Wargowski, Harlan Ross, Clayton A. Cramer, and the Town of Brookfield, Defendants-Appellants.

No. 85–2950.

United States Court of Appeals, Seventh Circuit.

Dec. 8, 1986.

Coffey, Circuit Judge, dissented and filed opinion.

Harold H. Fuhrman, Schetter, Keck & Fuhrman, Milwaukee, Wis., for defendants-appellants.

Walter M. Weber, Catholic League for Religious & Civil Rights, Milwaukee, Wis., for plaintiffs-appellees.

Before WOOD and COFFEY, Circuit Judges, and SWYGERT, Senior Circuit Judge.

SWYGERT, Senior Circuit Judge.

In this case we consider whether an organized group of anti-abortion activists may be prevented from picketing in front of the private residence of a physician who performs abortions as part of his medical practice. These picketers challenge, on constitutional grounds, a municipal ordi-

nance prohibiting all picketing in residential areas. The suit was filed by two members of the group against the municipality and its officers. After a hearing the district court enjoined the enforcement of the ordinance, ruling that it probably offended the first amendment. *Schultz v. Frisby,* 619 F.Supp. 792 (E.D.Wis.1985). On appeal the decision of the district court is affirmed.

## I

The Town of Brookfield, the situs of the controversy, is located in Waukesha County, Wisconsin, not far from Milwaukee. The Town covers an area of about five and one-half square miles and has a population of approximately 4300. State Highway 18, also known as the West Bluemound Road, is the Town's sole commercial thoroughfare. The remainder of the Town is residential. Brookfield's homes are grouped into subdivisions graced by their developers with imaginative names. One of those subdivisions is called the "Black Forest." It consists of fourteen homes and is zoned exclusively for single-family residences. The streets are thirty feet wide; there are no sidewalks, curbs, gutters, or streetlights.

One of the private residences in Black Forest is owned by Benjamin Victoria, M.D. Dr. Victoria performs abortions at clinics in Appleton, Wisconsin and Milwaukee. Dr. Victoria does not practice medicine in Brookfield. The house in Brookfield is the Victoria family's principal residence.[1]

Plaintiff-appellee Sandra Schultz is a former elementary schoolteacher who describes herself as a full-time housewife and mother. She believes that abortion is a "tragic and immoral injustice." In January of 1984 she helped found the Milwaukee

Coalition for Life, a group dedicated to stopping abortion through sidewalk counseling, picketing, and leafleting. Schultz is currently president of the Coalition.[2]

Plaintiff-appellee Robert Braun is a self-described "community activist" and "advocate on behalf of the poor and unemployed and other needy people." Braun strongly opposes abortion and believes in "caring and supportive alternatives" to the problems posed by an unwanted pregnancy.[3]

On April 20, 1985 the Milwaukee Coalition for Life sponsored the first of several picket lines in front of the Victoria residence to protest Dr. Victoria's performance of abortions. Between April 20 and May 20 the Victoria residence was picketed on at least six separate occasions. Schultz was present at picketing occurring on April 20, May 9, and May 20. Braun was present on May 16 and May 20. Estimates of the number of picketers on each occasion varied, but the number was never less than ten nor more than fifty. The picketing received extensive press coverage.[4]

The parties disagree as to the conduct of the picketers. The Town submitted sworn affidavits indicating that the picketing was not always calm and orderly. One of the Town's police officers stated that on April 27, 1985 he was called to the Victoria residence by Mrs. Victoria and observed that red ribbons had been tied onto the bushes and door of the house. Red ribbons are a symbol of the pro-life movement in Wisconsin. The ribbon-tying incident took place only minutes after a crowd of picketers had left the Victoria home.[5]

Another Town police officer stated that on April 20 he observed picketers singing "God Bless America" and carrying signs that said "baby killer." At the conclusion of the song the picketers shouted at the

---

1. Neither Dr. Victoria nor any member of his family is a party to this action. The record is devoid of reference to any other legal action related to this case.

2. Affidavit of Sandra C. Schultz, Record at 16.

3. Affidavit of Robert C. Braun, Record at 15.

4. Another anti-abortion group, "Project: Save Our Babies," based in Appleton, Wisconsin was involved in the picketing. Nothing in the record indicates why Dr. Victoria was singled out for those demonstrations.

5. Affidavit of Reid Brueser, Record at 29.

house, "Baby killer, Dr. Victoria, you're a killer, save our children," or words to that effect.[6] At other times the picketers carried signs inscribed with various anti-abortion themes such as "Stop Abortion Now," "Aborted Babies Sold for Cosmetics," "Abortion is Legal Murder," and "Forgiveness is Yours for the Asking."[7]

The family of a five-year-old boy, residing down the street from the Victorias, stated that on April 20 they saw a group of people marching on the street carrying signs about abortion and that one member of the group, "a lady with a cross," told the little boy that there was a man who lived up the road who killed babies and that the boy should not go there. The child became frightened and asked if the man would kill him too.[8]

A family living one block from the Victorias stated that their six-year-old daughter was told by picketers that Dr. Victoria was killing babies, that she had become frightened, and that they had been forced to explain abortion to her.[9]

The Victorias' son, age sixteen, stated that the picketers took his picture, shouted at him, and temporarily blocked his exit from his home.[10] Mrs. Victoria stated that she was blocked from entering her home and that the picketers placed a sign stating, "You are a shame to the United States," on her front door. She further stated that the picketers took photographs of her home and backyard pool and publish-

ed them in their organization's newsletter.[11]

Schultz and Braun have sworn that the picketing was entirely peaceful. They claim that the picketers confined themselves to the street, did not block traffic, and did not generate excessive noise. The plaintiffs submitted affidavits which supported their contention that the picketing was polite and restrained.[12] No arrests were made. Indeed, the defendants' own proposed statement of uncontested facts cited an article published in the *Milwaukee Sentinel* of May 21, 1985 that quoted a "neighbor of Victoria" as objecting more to Dr. Victoria's abortion activities than to the picketing.[13] The district court found that the picketing had been conducted, "for the most part," in a peaceable and orderly fashion.[14]

Schultz has stated that picketing of the Victoria residence is necessary because:

> Picketing at locations at which Victoria performs abortions would not accomplish what picketing on the public street by his house can accomplish. Such picketing would not serve to inform those dwelling in Victoria's neighborhood. Moreover, the greater media coverage of residential picketing allows us to reach audiences who might not otherwise receive our messages. As an additional concern, we do not wish to interfere with efforts of sidewalk counselors to contact prospective abortion clients; picketing near the Victorias' residence (away from the site

6. Affidavit of Scott M. Heitman, Record at 28.

7. 619 F.Supp. at 795.

8. Affidavits of Charles Setzke and Mary Setzke, Record at 25–26.

9. Affidavits of Paula Smith and Wallace Smith, Record at 20–21.

10. Affidavit of Todd Victoria, Record at 23.

11. Affidavit of Arlene Victoria, Record at 24.

12. Affidavits of William Peterman, Mary Baxa, and Mary Bruders, Record at 32, 33, 34.

13. Appellants' Appendix at 57, 63.

14. 619 F.Supp. at 795. Generally, of course, an appellate court is not entitled to pass upon the reliability of evidence presented to the trial court and we need not do so here. One exception to this rule, however, is when a legal dispute centers around the question of whether particular expressions constitute protected or unprotected speech. In these cases appellate courts are permitted a great deal more latitude in their examination of the testimony heard by the district court, despite Rule 52 of the Federal Rules of Civil Procedure. *Bose Corp. v. Consumers Union,* 466 U.S. 485, 503, 104 S.Ct. 1949, 1961, 80 L.Ed.2d 502 (1984); *Connick v. Myers,* 461 U.S. 138, 150 n. 10, 103 S.Ct. 1684, 1692 n. 10, 75 L.Ed.2d 708 (1983); *NAACP v. Claiborne Hardware,* 458 U.S. 886, 915–16 n. 50, 102 S.Ct. 3409, 3427 n. 50, 73 L.Ed.2d 1215 (1982).

of the abortions) removes the possibility of such problems, while more effectively conveying our messages to the abortionist and those in his community.[15]

On May 7, 1985, after the picketing had started, the Town of Brookfield enacted an ordinance that prohibited picketing before or about the residence or dwelling of any individual, except for picketing during a labor dispute of the place of employment involved in the labor dispute. The Town Attorney became convinced that the new ordinance conflicted with the Supreme Court's decision in *Carey v. Brown*, 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980), and instructed the Town Chief of Police to withhold enforcement. Picketing continued and the ordinance was repealed. On May 15, 1985 the Town passed a new ordinance, section 9.17 of the General Code. The key provision of the new ordinance reads: "It is unlawful for any person to engage in picketing before or about the residence or dwelling of any individual in the Town of Brookfield." The Town also set forth its rationale for the ordinance:

> It is declared that the protection and preservation of the home is the keystone of democratic government; that the public health and welfare and the good order of the community require that members of the community enjoy in their homes and dwellings a feeling of well-being, tranquility, and privacy, and when absent from their homes and dwellings, carry with them the sense of security inherent in the assurance that they may return to the enjoyment of their homes and dwellings; that the practice of picketing before or about residences and dwellings causes emotional disturbance and distress to the occupants; obstructs and interferes with the free use of public sidewalks and public ways of travel; that such practice has as its object the harassing of such occupants; and without resort to such practice full opportunity exists, and under the terms and provisions of this chapter will continue to exist for the exercise of freedom of speech and

other constitutional rights; and that the provisions hereinafter enacted are necessary for the public interest to avoid the detrimental results herein set forth.

There has been no picketing of the Victoria residence since May 21, 1985, the effective date of the picketing ordinance.

On July 2, 1985 Schultz and Braun brought suit under 42 U.S.C. § 1983 seeking declaratory and injunctive relief from an alleged deprivation of their rights under the first and fourteenth amendments of the United States Constitution. The defendants are Russell Frisby and George Hunt, Supervisors of the Town Board; Robert Wargowski, Chairman of the Town Board; Harlan Ross, Chief of Police; Clayton Cramer, Town Attorney; and the Town of Brookfield. A hearing on plaintiffs' request for a preliminary injunction was held on August 13, 1985. Finding that the picketers were likely to prevail on the merits, on October 7, 1985 the district court issued its decision granting the picketers a preliminary injunction and providing that the injunction would become permanent, absent an appeal or request for a trial, within sixty days. The basis of the district court's decision was that the ordinance was not narrowly tailored to advance the Town's asserted interests in protecting the privacy of its citizens and the unobstructed use of the streets and sidewalks. The defendants appealed.

## II

It is well-settled law that: "To obtain a preliminary injunction, a plaintiff must show: (1) that he has no adequate remedy at law or will suffer irreparable harm if the injunction is denied; (2) that the harm he will suffer is greater than the harm the defendant will suffer if the injunction is granted; (3) that the plaintiff has a reasonable likelihood of success on the merits; and (4) that the injunction will not harm the public interest." *ON/TV v. Julien*, 763 F.2d 839, 842 (7th Cir.1985). The decision to grant or deny a preliminary injunction

---

**15.** Record at 16.

will not be disturbed absent an abuse of discretion. *Burlington Northern RR v. Brotherhood of Maintenance of Way Employees,* 793 F.2d 795, 804 (7th Cir.1986); *Maxim's Ltd. v. Badonsky,* 772 F.2d 388, 390 (7th Cir.1985).

In *American Hospital Supply Corp. v. Hospital Products Ltd.,* 780 F.2d 589 (7th Cir.1986), a divided panel of this court seemed to cast doubt upon the continuing validity of this traditional approach. Building upon an earlier decision of this court, *Roland Machinery Co. v. Dresser Industries,* 749 F.2d 380 (7th Cir.1984), *American Hospital* appeared to suggest that these traditional considerations could be encapsulated in an algebraic formula. 780 F.2d at 593. Subsequent decisions of this court have clarified the meaning of the *American Hospital* decision. In *Lawson Products v. Avnet,* 782 F.2d 1429 (7th Cir. 1986), this court re-examined the doctrinal underpinnings of the law of preliminary injunctions and concluded, in light of the issues raised by the *American Hospital* formula, that "despite possible contrary readings of recent precedent, the granting of injunctive relief remains a discretionary equitable remedy." 782 F.2d at 1430. The court in *Lawson* explicitly endorsed the traditional approach to injunctive relief. "[T]his opinion represent[s] a continued affirmation of the traditional equitable factors governing injunctions and the classic roles of both district and appellate courts." *Id.* at 1441. "*Roland* and *American Hospital* did not change any of the law governing preliminary injunctions." *Id.* at

1437. A subsequent decision of this court agreed with the position taken by the panel in *Lawson. See Brunswick Corp. v. David Jones,* 784 F.2d 271, 1330 n. 1 (7th Cir.1986) ("*American Hospital* does not set forth a new standard for granting preliminary injunctions."); *see also Ball Memorial Hosp. v. Mutual Hosp. Ins.,* 784 F.2d 1325, 1346 (7th Cir.1986) (Will, J., concurring).

It should be obvious then, that concerns about the continuing validity of the traditional approach to preliminary injunctive relief in this circuit are misplaced. The law remains unchanged. Applying the law to the facts of this case, we conclude, for the reasons set forth below, that the district court did not abuse its discretion in granting the preliminary injunction.

### III

The first amendment prohibits governmental bodies from enacting laws "abridging the freedom of speech" or "the right of the people peaceably to assemble." [16] These words, by themselves, seldom serve to illuminate the precise contours of protected expression in cases such as the present one. Picketing, for example, is not an instance of "pure speech" because it usually involves conduct of some sort and may not include verbal utterances at all. Conduct is not always entitled to the same level of protection as pure speech. *Shuttlesworth v. Birmingham,* 394 U.S. 147, 152, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 (1969).[17] Nevertheless, "[t]here is no doubt

---

**16.** The first amendment provides in full:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. amend. I.

Though restricted by its terms to the United States Congress, the first amendment was extended to the states in *Gitlow v. New York,* 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925), through the due process clause of the fourteenth amendment. City ordinances are also covered by the first amendment. *Lovell v. Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938).

While we treat this case as implicating the free speech rights of the individual plaintiffs, we are not unaware of the collective character of picketing and the "close nexus between the freedoms of speech and assembly." *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 460, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958); *see also Citizens Against Rent Control v. Berkeley,* 454 U.S. 290, 294, 102 S.Ct. 434, 436, 70 L.Ed.2d 492 (1981) ("[T]he practice of persons sharing common views bonding together to achieve a common end is deeply embedded in the American political process.").

**17.** See *Thornhill v. Alabama,* 310 U.S. 88, 101 n. 18, 60 S.Ct. 736, 743–44 n. 18, 84 L.Ed. 1093 (1940), for a thorough survey of the many dif-

that as a general matter peaceful picketing and leafletting are expressive activities involving 'speech' protected by the First Amendment." *United States v. Grace,* 461 U.S. 171, 176, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983).

■ The Supreme Court has often stated that speech on issues of public concern occupies the "highest rung of the hierarchy of First Amendment values" and is entitled to "special protection." *Connick v. Myers,* 461 U.S. 138, 145, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983); *NAACP v. Claiborne Hardware,* 458 U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982); *Carey v. Brown,* 447 U.S. 455, 466–67, 100 S.Ct. 2286, 2293–94, 65 L.Ed.2d 263 (1980). The Court has characterized freedom of speech as a fundamental personal right, *Schneider v. State,* 308 U.S. 147, 161, 60 S.Ct. 146, 150–51, 84 L.Ed. 155 (1939), and "as the essence of self-government." *Garrison v. Louisiana,* 379 U.S. 64, 75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964).[18] The right to picket, however, like all other forms of expression, is not absolute and is subject to reasonable regulation. *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. International Soc'y for Krishna Con-*

*sciousness,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981).

There are several important limitations on the scope of the first amendment. The expressive activity for which a claim of protection is made must be appropriate to, or not incompatible with, its location. "The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983); *see also Cornelius v. NAACP Legal Defense and Education Fund,* 473 U.S. 788, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985); *Grayned v. Rockford,* 408 U.S. 104, 106, 92 S.Ct. 2294, 2297–98, 33 L.Ed.2d 222 (1972). In evaluating the appropriateness of expressive activity to a particular location courts employ the "public forum" doctrine. In places which by tradition have been devoted to assembly and debate the state's ability to limit expressive activity is "sharply circumscribed." *Perry,* 460 U.S. at 45, 103 S.Ct. at 955. In places not traditionally devoted to assembly or debate the state may nevertheless create a public forum by intent or custom. In these limited public forums a state may not enforce exclusions even if it need not have established the forum to begin with. *Id.* at 45, 103 S.Ct. at 955. In addition, certain government properties,

---

ferent forms picketing may take. Whether conduct may be considered protectible speech depends on whether "in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Spence v. Washington,* 418 U.S. 405, 411, 94 S.Ct. 2727, 2730–31, 41 L.Ed.2d 842 (1974); *see also Cox v. Louisiana,* 379 U.S. 536, 581, 85 S.Ct. 453, 470, 13 L.Ed.2d 431 (1965) (Black, J., concurring) ("Standing, patrolling or marching back and forth on streets is conduct, not speech, and as conduct can be regulated or prohibited.")

**18.** It is not clear that the activity engaged in by the plaintiffs is "political speech" in the strict sense of the term. In *Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 816, 104 S.Ct. 2118, 2135, 80 L.Ed.2d 772 (1984), for example, the Court distinguished political speech from "a host of other communications that command

the same respect." Among those communications, coincidentally, is the phrase, "Abortion is Murder." It is possible that after the Supreme Court's decision in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), opposition to abortion can no longer be characterized as political because, in some sense, the issue has been removed from the political process. In any event, we need not trouble ourselves too much with the proper labelling of the plaintiffs' communications. The Court has stressed that the first amendment fully protects philosophical, social, artistic, economic, literary, ethical, religious, and cultural matters—indeed, any matter of public interest. *See Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 231–32 n. 28, 97 S.Ct. 1782, 1797 n. 28, 52 L.Ed.2d 261 (1977); *Mine Workers v. Illinois Bar Ass'n,* 389 U.S. 217, 223, 88 S.Ct. 353, 356–57, 19 L.Ed.2d 426 (1967).

even if "public" in other respects, are non-public forums for first amendment purposes. *United States Postal Serv. v. Greenburgh Civic Ass'ns,* 453 U.S. 114, 129, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981); *Greer v. Spock,* 424 U.S. 828, 836, 96 S.Ct. 1211, 1216, 47 L.Ed.2d 505 (1976); *Adderly v. Florida,* 385 U.S. 39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966).

Regulations enacted for the purpose of restraining speech on the basis of its content "presumptively" violate the first amendment. *Renton v. Playtime The-atres,* —— U.S. ——, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986).[19] Content-neutral time, place, and manner regulations, however, are permitted if they are narrowly tailored to serve a substantial governmental interest and leave open ample alternative avenues of communication. *Clark v. Community for Creative Non-Violence,* 468 U.S. at 293, 104 S.Ct. at 3069.[20] In *City of Watseka v. Illinois Public Action Council,* 796 F.2d 1547, 1552 (7th Cir.1986), we stated that a time, place, and manner restriction on expressive activity may be sustained only if the Government can show that the restriction (1) is content neutral, (2) serves a legitimate governmental objective, (3) leaves open ample alternative channels of communication, and (4) is narrowly tailored to serve the governmental objective. To establish that a regulation is narrowly tailored the Government must show that there is a "significant relationship between the regulation and the governmental interest ... and that less restrictive alternatives are inadequate to protect the governmental interest." *Id.*

## IV

We must first decide whether the street fronting Dr. Victoria's home is a public forum for purposes of the first amendment.[21] We begin with the proposition that streets have historically been considered particularly appropriate locations for public assembly and debate.

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied.

*Hague v. CIO,* 307 U.S. 496, 515–16, 59 S.Ct. 954, 963–64, 83 L.Ed. 1423 (1939). The Supreme Court has repeatedly reaffirmed the *Hague* principle. *See, e.g., United States v. Grace,* 461 U.S. at 177, 103 S.Ct. at 1707 ("public places historically associated with the free exercise of expressive activities, such as streets, sidewalks,

**19.** Absolute prohibitions on a particular type of expression will be upheld only if narrowly drawn to accomplish a *compelling* governmental interest. *United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983); *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). Because the Brookfield ordinance is limited, at least in respect to place, we shall treat it as a time, place, or manner restriction.

**20.** In the seminal case of *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), the Court articulated the constitutional standard by which regulations like the Brookfield ordinance are judged.

> [A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. 391 U.S. at 376–77, 88 S.Ct. at 1679 (footnotes omitted).

**21.** The public forum analysis may be less useful in those cases "falling between the paradigms of government property interests." *Taxpayers for Vincent,* 466 U.S. at 815 n. 32, 104 S.Ct. at 2134 n. 32; *Greenburgh,* 453 U.S. at 132, 101 S.Ct. at 2686.

and parks, are considered, without more, to be 'public forums' "); *Amalgamated Food Employees Union v. Logan Valley Plaza,* 391 U.S. 308, 315, 88 S.Ct. 1601, 1607, 20 L.Ed.2d 603 (1968) ("streets ... are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely"); *see also Carey v. Brown,* 447 U.S. at 460, 100 S.Ct. at 2290; *Hudgens v. NLRB,* 424 U.S. 507, 515, 96 S.Ct. 1029, 1034, 47 L.Ed.2d 196 (1976); *Shuttlesworth v. Birmingham,* 394 U.S. at 152, 89 S.Ct. at 939.

It is not intuitively obvious, however, that all streets, in all places, must automatically be considered public forums. There are no doubt thousands of subdivisions scattered throughout this country, like the one involved in this case, on whose streets little, if any, first amendment activity has ever taken place. Homes like the Victorias' were conceived, built, and purchased as private residences, havens from our loud and contentious inner cities. It seems incongruous to decide that this particular street is a public forum simply because streets in general have historically been centers of expressive activity.[22]

In *Pursley v. Fayetteville,* 628 F.Supp. 676 (W.D.Ark.1986), the district court upheld the constitutionality of an ordinance essentially identical to the ordinance involved in this case. In *Pursley* the ordinance was also challenged by anti-abortion picketers wishing to picket the residence of a doctor who performed abortions as part of his medical practice. The *Pursley* court held that streets and sidewalks located in residential areas are not public forums. 628 F.Supp. at 679–80.

Nevertheless, the Supreme Court has always placed all streets, regardless of their differing characteristics, into the same privileged category for first amendment purposes. Twice, for instance, the Supreme Court has upheld the right of demonstrators to picket the streets fronting the private residence of the Mayor of Chicago. *Carey v. Brown,* 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980); *Gregory v. City of Chicago,* 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969). In neither case was the residential character of the neighborhoods sufficient to transform the streets at issue from public to non-public forums. In *Heffron v. International Society for Krishna Consciousness,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), the Court rejected the respondents' attempt to equate, for first amendment purposes, streets and the state fairgrounds at issue in that case. "[I]t is clear that there are significant differences between a street and the fairgrounds. A street is continually open, often uncongested, and constitutes not only a necessary conduit in the daily affairs of a locality's citizens, but also a place where people may enjoy the open air or the company of friends and neighbors in a relaxed environment." *Id.* at 651, 101 S.Ct. at 2566. Justice White's description of a hypothetical "street" entitled to characterization as a quintessential public forum serves as an accurate description of the Brookfield street in this case. The public forum status of streets and sidewalks may not be altered by legislative fiat. *United States v. Grace,* 461 U.S. at 180, 103 S.Ct. at 1708–09; *Greenburgh,* 453

---

**22.** In *ACORN v. City of Phoenix,* 603 F.Supp. 869 (D.Ariz.1985), the court upheld restrictions on solicitation on street intersections and declined to automatically apply the *Hague* principle merely because the forum in question appeared to qualify as a "street." In *ACORN v. City of New Orleans,* 606 F.Supp. 16 (E.D.La.1984), on similar facts, the court held precisely to the contrary. Judge Adams of the Third Circuit has expressed concern that the application of the public forum doctrine may be becoming too mechanical and rigid. "I am concerned that an analysis which relies too heavily on whether an area ... has traditionally been regarded as a public forum fails to come to grips with the fact that legal concepts need to evolve to reflect underlying social realities." *International Soc'y for Krishna Consciousness v. New Jersey Sports and Exposition Auth.,* 691 F.2d 155, 163 (3d Cir.1982) (Adams, J., statement sur denial of the petition for rehearing). *Compare* Kamin, *Residential Picketing and the First Amendment,* 61 Nw.U.L.Rev. 177 (1966) *with* Haiman, *Speech v. Privacy: Is There A Right Not To Be Spoken To?,* 167 Nw.U.L.Rev. 153 (1972).

U.S. at 133, 101 S.Ct. at 2687. Despite the tremendous changes in the patterns of residential life since the *Hague* decision, streets remain proper and natural places for the dissemination of ideas.

A holding that streets located in residential areas are not public forums would represent a radical departure from the general direction of first amendment jurisprudence. Such a holding would effectively place vast areas of this country out of the reach of the protection of the first amendment. Indeed, if streets like that fronting Dr. Victoria's home are not protected by the first amendment, then primarily residential towns, like Brookfield, may effectively confine the right of their citizens to be exposed to a diversity of views on issues of public concern to those tiny areas of the community classified as "commercial" or "governmental." The importance of free expression to our constitutional scheme of government makes this result inconceivable.

▮ We think that if the issue were squarely presented to the Supreme Court it would hold that all streets, regardless of their situs, are public forums, and we therefore conclude that the Brookfield picketing occurred in a public forum.[23]

### V

▮ This conclusion, however, does not answer the vexing questions that remain. We must also consider whether the Brookfield ordinance leaves open ample alternative channels for communication. *Cf. Clark v. Community for Creative Non-Violence,* 468 U.S. at 293, 104 S.Ct. at 3069. For "a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate." *Los Angeles v. Taxpayers for Vincent,* 466 U.S.

789, 812, 104 S.Ct. 2118, 2133, 80 L.Ed.2d 772 (1984). And "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. State,* 308 U.S. at 163, 60 S.Ct. at 151–52.

There are no clear guideposts to assist courts in determining when an alternative forum is "adequate." The thrust of the cases seems to be that an alternative forum will not be judged inadequate because it restricts the quantity of the means of expression. *See, e.g., Taxpayers for Vincent,* 466 U.S. at 803, 104 S.Ct. at 2128. The Supreme Court seems to have analyzed the issue in terms of its effect on the *quality* of the means of expression. The restricted forum must constitute a "uniquely valuable or important mode of communication." *Id.* at 812, 104 S.Ct. at 2133.

In *Renton v. Playtime Theatres,* 106 S.Ct. at 925, the Court rejected claims that a zoning ordinance which prohibited motion picture theatres from locating within 1000 feet of a residential zone, church, park, or school did not allow for reasonable alternative avenues of communication where five percent of the land area of the city remained open to unrestricted use as adult theatre sites. In *Taxpayers for Vincent* the Court upheld a ban on the posting of signs on public property because the ban did not "affect any individual's freedom to exercise the right to speak ... *in the same place* where the posting of signs on public property is prohibited." 466 U.S. at 812, 104 S.Ct. at 2133 (emphasis added). But in *Linmark Associates v. Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977), the Court struck down a town ordinance that banned the posting of "For Sale" signs on real estate because the ban

---

**23.** A time, place, and manner restriction may not be based upon either the content or subject matter of speech. *Heffron,* 452 U.S. at 648, 101 S.Ct. at 2564. The Brookfield ordinance on its face bans all forms of picketing without exception. State law, however, prohibits Brookfield from banning labor picketing. Wis.Stat. § 103.-53(1)(e) (1984). Schultz and Braun argue that the Brookfield ordinance thus necessarily incor-

porates an implied labor exception. In *Carey v. Brown,* the Supreme Court struck down an Illinois statute that banned residential picketing, but exempted labor picketing. 447 U.S. at 460, 100 S.Ct. at 2290. The district court in the instant case concluded that this claim was meritless. On appeal, we decline to reconsider the district court's decision. Our decision, like the district court's, is based solely on federal law.

forced sellers to employ entirely different kinds of advertising, such as the newsmedia.

There is no question that picketing *per se* is a valuable form of communication. The more difficult question is whether picketing *in a residential neighborhood* is an essential, "uniquely valuable," element of the message Schultz and Braun seek to communicate. The question we must answer is whether the plaintiffs may effectively deliver their message elsewhere without, at the same time, changing the character of that message. The Brookfield ordinance restricts picketing to the commercial strip along West Bluemound Road, the Town's main thoroughfare. We think it clear that in so doing the ordinance significantly impacts upon the *quality* of the means of expression Schultz and Braun have chosen to communicate their message. Forcing Schultz and Braun to picket in non-residential areas would be, in effect, to force them to engage in an entirely different form of expressive activity. Consigned to the "safe" and busy area along Bluemound Road, they may be conveniently ignored by passersby. They may be written off as eccentric and irrelevant nuisances. Residential picketing, however, does not permit the citizens of Brookfield to ignore or trivialize the message the picketers wish to communicate. Residential picketing, quite literally, brings the message home. More importantly, the fact that the message may reach and disturb families and children is clearly part of the point of the picketing, for, to a certain extent, the picketers seek to communicate their concerns about a perceived assault on the family and on childhood itself. There can be no better place to convey those concerns than in a residential area. The disturbance occasioned by the residential picketing in this case is actually one measure of its unique value as a means of communicating Schultz' and Braun's concerns. We conclude, therefore, that the Brookfield ordinance does not provide ample, alternative channels of communication.

## VI

Neither Schultz nor Braun has been charged with a violation of the ordinance. Nothing in the record indicates that the ordinance has been enforced against anyone else. The general rule is that "constitutional adjudication requires a review of the application of a statute to the conduct of the party before the Court." *Taxpayers for Vincent,* 466 U.S. at 798, 104 S.Ct. at 2125. This rule reflects both the personal nature of constitutional rights and prudential limitations on constitutional adjudication. *New York v. Ferber,* 458 U.S. 747, 767, 102 S.Ct. 3348, 3360, 73 L.Ed.2 1113 (1982). *See generally Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). In some cases, however, courts have invalidated statutes "on their face" without inquiring into their particular applications to specific facts. An ordinance may be constitutionally invalid on its face "either because it is unconstitutional in every conceivable application, or because it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally 'overbroad.'" *Taxpayers for Vincent,* 466 U.S. at 796, 104 S.Ct. at 2124. In either case illegitimate enforcement of the statute against the complaining party will not be required. An ordinance is unconstitutional in every conceivable application because *"any* enforcement carries with it the risk that the enforcement is being used merely to suppress speech, since the statute is not aimed at a substantive evil within the power of the government to prohibit." *Id.* at 797 n. 14, 104 S.Ct. at 2125 n. 14 (emphasis in original). This is almost a rule of *per se* unconstitutionality. Laws invalidated on this basis fail to define a "central core of constitutionally regulable conduct." *New York v. Ferber,* 458 U.S. at 771 n. 26, 102 S.Ct. at 3362 n. 26; *Parker v. Levy,* 417 U.S. 733, 760, 94 S.Ct. 2547, 2563–64, 41 L.Ed.2d 439 (1974); *CSC v. Letter Carriers,* 413 U.S. 548, 580–81, 93 S.Ct. 2880, 2897–98, 37 L.Ed.2d 796 (1973). *See generally* Note, *The First Amendment Overbreadth Doctrine,* 83 Harv.L.Rev. 844 (1970).

An ordinance may also be constitutionally invalid on its face if it is written so broadly that it may inhibit—have a "chilling effect" on—the protected speech of third parties. *Taxpayers for Vincent*, 466 U.S. at 796, 104 S.Ct. at 2124; *Thornhill v. Alabama*, 310 U.S. 88, 97–98, 60 S.Ct. 736, 741–42, 84 L.Ed. 1093 (1940). This form of the overbreadth doctrine—the "classic" form of the doctrine—relaxes ordinary standing rules by permitting parties to raise the rights of third parties not before the court.[24] Though the Court has cautioned that constitutionally invalid overbreadth must be "substantial" where conduct and not merely speech is involved, and that the doctrine itself should be invoked "only as a last resort," *Broadrick v. Oklahoma*, 413 U.S. at 613, 93 S.Ct. at 2916, the Court has often invalidated statutes on the basis of this doctrine. *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980); *Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *Dombrowski v. Pfister*, 380 U.S. 479, 486, 85 S.Ct. 1116, 1120–21, 14 L.Ed.2d 22 (1965). *See generally* Monaghan, *Overbreadth*, 1981 S.Ct.Rev. 1.

These two types of facial challenges to the constitutionality of legislative enactments are often conflated. " '[O]verbreadth' is not used only to describe the doctrine that allows a litigant whose own conduct is unprotected to assert the rights of third parties to challenge a statute, even though as applied to him the statute would be constitutional. 'Overbreadth' has also been used to describe a challenge to a statute that in all its applications directly restricts protected first amendment activity and does not employ means narrowly tailored to serve a compelling governmental interest." *Secretary of State of Maryland v. J.H. Munson Co.*, 467 U.S. 947, 965–66 n. 13, 104 S.Ct. 2839, 2852 n. 13, 81 L.Ed.2d 786 (1984) (citations omitted); *see also Central Hudson Gas & Elec. v. Public Serv. Comm'n*, 447 U.S. 557, 565 n. 8, 100 S.Ct. 2343, 2351 n. 8, 65 L.Ed.2d 341 (1980). In this case we are not presented with an instance in which the application of the classic overbreadth doctrine is appropriate. The facial challenge to the Brookfield ordinance is of the *per se* type upheld in *J.H. Munson*.

The complaint in this case is not that the ordinance might violate the rights of other potential picketers, but rather that the ordinance is unconstitutional and would constitute a direct restriction on protected first amendment activity if applied to Schultz and Braun and would be *per se* unconstitutional if applied against any type of picketing or picketer. The Supreme Court has frequently invalidated statutes or ordinances that impinged upon protected expression "on their face" on the basis that no conceivable application of the statute could be constitutional. *See, e.g., Saia v. New York*, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948); *Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); *Lovell v. Griffin*, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938).

The district court based its decision to issue the preliminary injunction in this case on a finding that the picketers were likely to prevail on the merits because the ordinance was not narrowly tailored to advance the Town's legitimate interest in protecting the privacy of its citizens or the public use of the streets and sidewalks. The requirement that a legislative enactment affecting expressive activity be narrowly tailored means simply that the questioned regulation "may extend only as far as the interest it serves." *Central Hudson*, 447 U.S. at 565, 100 U.S. at 2351. The state cannot "completely suppress information when narrower restrictions on expression would serve its interest as well." *Id.* Since a proposed restriction on expressive activity must be narrowly drawn to further a significant governmental interest, the Government must demonstrate that its objectives will not be served by means less restrictive of first amendment freedoms. *ACORN v.*

24. Declaratory judgments may serve much the same purpose. 28 U.S.C. § 2201.

*Frontonac,* 714 F.2d 813, 818 (8th Cir. 1983).[25]

■ In *Central Hudson,* for example, the Court struck down a state regulation that prohibited an electric utility company from advertising to "promote the use of" electricity. The regulation was not narrowly tailored because the state's interest in encouraging its citizens to conserve energy did not support a ban against a utility that might seek to "promote the use of" more efficient electrical products. In *J.H. Munson,* 467 U.S. at 965–68, 104 S.Ct. at 2851–53, the Court struck down a state statute that prohibited a charitable organization from spending more than twenty-five percent of solicited funds on administrative costs. "The flaw in the statute is not simply that it includes within its sweep some impermissible applications, but that in all its applications it operates on a fundamentally mistaken premise that high solicitation costs are an accurate measure of fraud." *Id.* at 966, 104 S.Ct. at 2852. The means chosen to further the state's interests were judged "too imprecise" to save the statute from a facial challenge. We hold that the Brookfield ordinance is similarly flawed. The ordinance does not represent a sufficiently narrow and precise response to the concerns motivating its passage. There are less restrictive means available to the Town to address its legitimate concerns. Picketing is not by its very nature an activity inherently disruptive of the coherency of an American neighborhood. Although we do not doubt that the secondary effects of picketing—noise, obstructiveness, trespass, litter, etc.—may be regulated, picketing may not be barred altogether merely because it occurs in a residential area. An ordinance which attempts just that can never be constitutional.

## VII

In order to justify an impairment of expressive activity Brookfield must demonstrate the existence of a significant governmental interest. Any number of such interests are imaginable. It is not our place, however, to invent justifications for the Brookfield ordinance. In this case any speculation would be utterly pointless since the Town itself has indicated that it enacted the ordinance to serve two interests: (1) the privacy interests of its residents; and (2) its interest in regulating vehicular and pedestrian traffic patterns. Of these two, it is clear that the privacy issue is the most important justification for the statute and the issue on which the parties and the district court focused their attention. Although the interest in regulating traffic is legitimate, it constituted only a minor part of the Town's interest in the ordinance. Moreover, there has been no evidence introduced that the picketers in any way interfered with the flow of traffic. Indeed, the Town's own evidence clearly indicated that the picketing had a negligible impact on traffic. Even the statements of the Victoria family that their egress from their home was impeded must be understood not as impairments to traffic patterns, but as assaults on the physical integrity—the privacy—of the family. We will treat the privacy issue as the sole motivation for the ordinance.

The stated interest of the Town in protecting the privacy of its residents is clearly a significant governmental interest. When the privacy of the homestead itself is in question, the rights of individuals to be

---

**25.** The Third Circuit has held that the proponent of a regulation of expressive activity in a non-public forum need not prove that there are less restrictive alternatives available, but merely that ample alternative avenues of communication remain open. *Pennsylvania Alliance for Jobs and Energy v. Council of Munhall,* 743 F.2d 182, 186 (3d Cir.1984). This court has suggested that *Munhall* creates a conflict with the Eighth Circuit's decision in *Frontonac. Wisconsin Action Coalition v. City of Kenosha,* 767 F.2d 1248, 1253–54 (7th Cir.1985). Because we read *Munhall* as being confined to non-public forums, we believe any conflict is more apparent than real. In any case, *Kenosha* clearly suggested, and *City of Watseka v. Illinois Pub. Action Council,* 796 F.2d 1547 (7th Cir.1986), conclusively decided, that this court would follow the Eighth Circuit's view. We note in passing that the analytical task assigned to courts by these two standards are, in any event, closely related.

let alone sometimes outweigh the rights of others to communicate. In *Rowan v. Post Office Department*, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970), the Court upheld postal regulations that permitted a householder to request the United States Post Office Department to stop the flow of unwanted or offensive mail. In *FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), the Court upheld Federal Communication Commission regulations restricting the type of speech that may be heard on the airwaves, and thus, in the home itself. The right to privacy is at its strongest when expression intrudes into the privacy of the home or is aimed at captive or unwilling audiences. *Erznoznik v. Jacksonville*, 422 U.S. 205, 209, 95 S.Ct. 2268, 2272, 45 L.Ed.2d 125 (1975). We believe the Town's interest in protecting the residential character of the community is of the utmost importance. Nevertheless, the right to privacy "must be placed in the scales with the right of others to communicate." *Rowan*, 397 U.S. at 736, 90 S.Ct. at 1490. The balance, in this case, tips toward the right of the picketers to disseminate their views.

The conflict between the first amendment and the desire of municipalities to protect the sanctity of the home has occasioned much discussion in the courts of this land. In three cases decided in 1943 the Supreme Court struck down restrictions on the right of religious organizations to engage in door-to-door solicitation for the sale of religious literature and the propagation of their views. *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); *Martin v. Struthers*, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); *Douglas v. Jeannette*, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943). These cases involved members of the Jehovah's Witnesses, a religious organization particularly unpopular with governmental officials in the 1940's. Their literature was described by the Court as "provocative, abusive, and ill-mannered." *Murdock*, 319 U.S. at 115–16, 63 S.Ct. at 876. In affirming the right to engage in such communication, the Court observed: "The authors of the First Amendment knew that novel and unconventional ideas might disturb the complacent, but they chose to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance." *Martin*, 319 U.S. at 143, 63 S.Ct. at 863. "Plainly a community may not suppress ... the dissemination of views because they are unpopular, annoying or distasteful." *Murdock*, 319 U.S. at 116, 63 S.Ct. at 876. Dissenting in both *Murdock* and *Martin* and concurring in *Douglas*, Justice Jackson chastised the Court for "denying the American's deepseated conviction that his home is a refuge from the pulling and hauling of the marketplace and the street." *Douglas*, 319 U.S. at 181, 63 S.Ct. at 889 (Jackson, J., concurring). Though there are, of course, important differences between those cases and our own, the issues they raise are not fundamentally dissimilar. We note that in *Murdock* a municipal ordinance that banned all solicitation for orders of merchandise within the town limits had been narrowly construed by the Pennsylvania courts as banning only residential solicitation "door to door and house to house." *Murdock*, 319 U.S. at 117 n. 10, 63 S.Ct. at 877 n. 10. The Court nevertheless rejected the constitutionality of the statute even when so constructed. "The ordinance is not narrowly drawn to prevent or control abuses or evils arising from [residential solicitation]. Rather, it sets aside the residential areas as a prohibited zone, entry of which is denied petitioners unless [a] tax is paid. That restraint and the one which is city-wide in scope are different only in degree. Each is an abridgment of freedom of press.... They stand or fall together." *Murdock*, 319 U.S. at 117, 63 S.Ct. at 877. We read *Murdock* as standing for the proposition that the residential situs of expressive activity subject to regulation is of no constitutional significance. The constitutionality of a limitation on communication may not depend on whether the communication is directed at city hall or at the home.

At the same time concerns about the effects on individual privacy that any particular activity may have may be taken into account when enacting legislation. "In the sphere of collision between claims of privacy and those of free speech or free press, the interests on both sides are plainly rooted in the traditions and significant concerns of our society." *Erznoznik*, 422 U.S. at 208, 95 S.Ct. at 2272. Homeowners in communities like Brookfield have some reasonable expectation of privacy. People who care passionately about a particular political or social issue have a right to be heard. On the one hand, "[no]thing in the Constitution compels us to listen or view any wanted communication, whatever its merit." *Rowan*, 397 U.S. at 737, 90 S.Ct. at 1490. On the other hand, "the Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer." *Erznoznik*, 422 U.S. at 210, 95 S.Ct. at 2273. Of course, to say that a municipal enactment must strike a sensitive balance between the right of free expression and the right to be free from expression is to beg at least two important questions. The first is what our society has come to mean by the use of the term "home." The second is how courts can determine whether an audience is willing or unwilling to receive a specific message.

No Supreme Court case has defined the outer limits of what is meant by the concept of "home." Is a home strictly limited to the four walls of a building serving as a private residence? Or does the concept of home somehow encompass an area of peace and security related to, but not strictly limited by, the walls of a house? In *Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949), the Court upheld restrictions on excessively loud sound amplification in residential neighborhoods. In *Kovacs* there was no actual physical invasion of the walls of a house, but excessive noise may sometimes serve as a more than adequate substitute for physical intrusion. By the same token, in a long line of cases, the Court has struck down restrictions on door-to-door solicitation or canvassing activities although these activities clearly brought the speaker closer to the actual physical shell of the home. We doubt that any exact definition of home is possible and we shall not attempt one here. The concept of home is tied to social and cultural conditions and those are constantly in flux. Nevertheless, though the cases are difficult to synthesize, it is fair to say that the Court has adopted a rather narrow understanding of the concept of home. In no case has the Court's understanding of the concept of home extended to encompass quiet and orderly demonstrations on the streets and sidewalks.

It is also unclear how one is to separate conceptually, or actually, willing from unwilling listeners. One person's heresy is another's orthodoxy; the tamest discourse may be heard as a thunderous philippic. Maybe all of Dr. Victoria's neighbors disapproved of the plaintiffs' picketing, but maybe somewhere in the community the picketers' chants fell on sympathetic ears. What seems relatively clear is that a municipality may not decide for its citizens what messages they may receive. Privacy, by definition, is a right that adheres to the person, and not to the community. The Town of Brookfield has usurped its citizens' right to decide for themselves what they shall, or shall not, hear and see. We do not live in a society where that is acceptable.

In *Gregory v. City of Chicago*, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969), demonstrators pressing for desegregation of the City of Chicago's schools picketed in front of the mayor's house. The picketing attracted large numbers of hostile bystanders. Fearful of impending civil disorder, the police ordered the demonstrators to disburse. They refused, were arrested, and were convicted of disorderly conduct. The Court reversed the convictions for lack of evidence that the demonstrators' conduct was, in fact, disorderly. "This," wrote Chief Justice Warren for the Court, "is a simple case." 394 U.S. at 111, 89 S.Ct. at 947.

Justice Black concurred in the judgment of the Court, but could not agree that the case was simple. "Plainly ... no mandate in our Constitution leaves States and governmental units powerless to pass laws to protect the public from the kind of boisterous and threatening conduct that disturbs the tranquility of spots selected by the people ... for homes, wherein they can escape the hurly-burly of the outside business and political world." 394 U.S. at 118 (Black, J., concurring). Without limitations on speech-related conduct, "homes, the sacred retreat to which families repair for their privacy and their daily way of living, would have to have their doors thrown open to all who desired to convert the occupants to new views, new morals, and a new way of life." 394 U.S. at 125, 89 S.Ct. at 954.

The force of Justice Black's views was acknowledged in *Carey v. Brown.* "The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." *Carey,* 447 U.S. at 471, 100 S.Ct. at 2296. But the Town's interest in protecting the privacy of the home cannot justify draconian prohibitions on picketing. The *Carey* Court, for instance, acknowledged that "[n]umerous types of peaceful picketing other than labor picketing would have but a negligible impact on privacy interests." 447 U.S. at 469, 100 S.Ct. at 2294. Moreover, a certain amount of discord is to be expected, even desired, as a secondary effect of expressive activity. "[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they

are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea." *Terminiello v. Chicago,* 337 U.S. 1, 4–5, 69 S.Ct. 894, 895–96, 93 L.Ed. 1131 (1949); *see also Edwards v. South Carolina,* 372 U.S. 229, 237, 83 S.Ct. 680, 684, 9 L.Ed.2d 697 (1963). To an extent, disruption is the price of living in a free society.

Our task would be easier if we had the benefits of an ample body of law addressing the issues raised by this appeal. Unfortunately, no case from this court is directly on point. In *Collin v. Smith,* 578 F.2d 1197 (7th Cir.), *cert. denied,* 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978), this court held that the Village of Skokie, Illinois could not prohibit a planned demonstration by members of the National Socialist Party of America despite the fact that a clear majority of the Village's residents would find the demonstration "an invasion, intensely menacing no matter how peacefully conducted." 578 F.2d at 1206. The court rejected the Village's attempt to justify restrictions of the planned demonstration on the basis of its citizens' substantial privacy interests. *Id.* at 1207. The Skokie demonstration, however, was focused on the Village Hall, with only inevitable, incidental intrusions on peoples' homes.[26]

Our research has discovered only two federal appellate decisions on point. In *Garcia v. Gray,* 507 F.2d 539 (10th Cir. 1974), *cert. denied,* 421 U.S. 971, 95 S.Ct. 1967, 44 L.Ed.2d 462 (1975), the Tenth Circuit rejected the exact constitutional objections raised in this case against a virtually identical municipal ordinance. In *Garcia* demonstrators picketed the residence of the

**26.** In *Concerned Jewish Youth v. McGuire,* 621 F.2d 471 (2d Cir.1980), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1352, 67 L.Ed.2d 337 (1981), the court upheld restrictions on demonstrations at the Russian Mission to the United Nations relying, in part, on the privacy interests of the people living near the Mission. In *Carey v. Brown* the Supreme Court specifically declined to decide whether a statute that prohibited all residential picketing could be constitutional. 447 U.S. at 459 n. 2, 100 S.Ct. at 2289 n. 2. This

court had previously chosen to do likewise. *Brown v. Scott,* 602 F.2d 791, 795 n. 6 (7th Cir.1979). The trial court in that case, however, had found it necessary to decide the issue and had held that a total ban on residential picketing was constitutionally permissible. 462 F.Supp. 518 (N.D.Ill.1978); *see also People Acting Through Community Effort v. Doorley,* 338 F.Supp. 574 (D.R.I.1972), *rev'd,* 468 F.2d 1143 (1st Cir.1972).

mayor of the town. The town enacted an ordinance making it unlawful for any person to picket before or about the residence or dwelling of any individual. The court upheld the ordinance holding it to be a "valid exercise of governmental power." 507 F.2d at 545.

In *Davis v. Francois*, 395 F.2d 730 (5th Cir.1968), the Fifth Circuit struck as violative of the first and fourteenth amendments a municipal ordinance making it unlawful for more than two people to picket in front of a residence, a place of business, or a public building. Pursuant to this ordinance demonstrators picketing the local school board building were arrested. The Fifth Circuit held that the ordinance had not been narrowly or precisely drawn to redress proscribable conduct. *Id.* at 735–36. While the ordinance in *Francois* is not exactly like the one in the present case,[27] it is similar enough to be relevant to our analysis. We think *Francois* more accurately represents the direction of first amendment law than does the decision of the Tenth Circuit in *Garcia*.

The defendants rely heavily on the decision of the Wisconsin Supreme Court in *City of Wauwatosa v. King*, 49 Wis.2d 398, 182 N.W.2d 530 (1971). In *Wauwatosa* the court upheld the constitutionality of a municipal ordinance virtually identical to that struck down in *Carey v. Brown*. In light of *Carey* we doubt that *Wauwatosa* is a viable precedent. Moreover, we do not believe that the *Wauwatosa* court had a realistic view of the current status of the American family and the American home. "Home," we are told, "is where the wife expects, in addition to the work of the household and the care of the children, to have some moments of peace and calmness." 49 Wis.2d at 411, 182 N.W.2d at 537. In *State v. Schuller*, 280 Md. 305, 372 A.2d 1076 (1977), Maryland's highest court, reviewing a nearly identical statute, rejected the approach of *Wauwatosa*. "[W]e

believe that the statutory ban on all residential picketing is invalid on its face as violative of the right to freedom of speech." 372 A.2d at 1082.

Finally, in two recent cases, this court struck down far narrower restrictions on expressive activity at least as intrusive on residential privacy as the picketing that occurred in this case. *City of Watseka v. Illinois Public Action Council*, 796 F.2d 1547 (7th Cir.1986); *Wisconsin Action Coalition v. City of Kenosha*, 767 F.2d 1248 (7th Cir.1985). In both *Watseka* and *Kenosha*, relying on a long line of Supreme Court solicitation cases,[28] we invalidated limitations on door-to-door solicitation. Yet, in door-to-door solicitation the unwilling target of the message is actually forced to confront the speaker. The householder cannot draw the blinds to shield herself from an unwelcome visage or turn up the stereo to drown out an unpleasant voice. In neither *Kenosha* nor *Watseka* did the municipality attempt a total ban on residential solicitation. It would, quite simply, not make analytical sense for us to uphold the ordinance presently under review given the protections we have extended to residential solicitation. Although this is not a case of first impression, neither is it a case whose result is dictated by *stare decisis*. Nevertheless, we believe our decision is fully consonant with the first amendment jurisprudence of the Supreme Court and with our own previous decisions.

## VIII

By deciding this case the way we do, we do not express approval of the alleged conduct of the picketers in front of Dr. Victoria's home. There is nothing laudable about frightening children or harassing their parents. Sensitivity to the rights of unborn children is not likely to be advanced by insensitivity to rights of already living children. We point out, however, that the

---

27. The *Francois* ordinance is broader as to place, but narrower as to manner, *i.e.*, it is not limited to residences, but neither does it eliminate picketing entirely in the affected areas. *See* 395 F.2d at 732.

28. *See Kenosha*, 767 F.2d at 1251 (listing Supreme Court solicitation cases).

charges levelled against the picketers remain merely allegations. We are not asked to pass judgment upon the conduct of the plaintiffs, but rather on the constitutionality of an ordinance banning even peaceful and orderly picketing. If the conduct of anyone within the municipal boundaries of Brookfield is objectionable, then the Town may pass laws directed at that part of the conduct that is legally actionable. To a large extent the Town already has the legal weaponry necessary to defeat disruptive and constitutionally unprotected conduct. Brookfield, for example, has ordinances on its books that prohibit the obstruction of streets and sidewalks, loud and unnecessary noise, destruction of property, littering, criminal trespass to land, criminal trespass to dwellings, and disorderly conduct. 619 F.Supp. at 794–95. Picketers may be prosecuted each time they violate any of those provisions. At oral argument, counsel for the Town asserted that these existing ordinances are difficult to enforce. Any difficulties in the enforcement of these ordinances cannot justify the total ban on residential picketing. Where the first amendment is involved, civil authorities may not take legislative shortcuts.

It is most assuredly not our place to attempt to draft a constitutionally valid ordinance regulating residential picketing. Nevertheless, an ordinance is more likely to be constitutionally acceptable if it does not incorporate expressive activity as part of the definition of the proscribable conduct. An ordinance, for example, making it unlawful to distribute circulars or handbills without the permission of the chief of police would certainly violate the first amendment even if the justification for such an ordinance is the municipality's legitimate interest in controlling litter. On the other hand, a statute simply making it unlawful to litter would almost certainly not offend the Constitution. *See Schneider v. State,* 308 U.S. at 162–63, 60 S.Ct. at 151–52. A municipality's right to regulate the time, place, and manner of communication necessarily incorporates the duty to balance the right of expression against the homeowner's right to privacy. The delicacy of that balance can never justify the simple solution of doing away with picketing altogether.

## IX

The first amendment, Justice Holmes wrote, "is an experiment, as all life is an experiment." *Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1920) (Holmes, J., dissenting). It is a test of the proposition that a nation may permit its decisions to be questioned, examined, discussed, and challenged—and yet survive. Persecution for the expression of opinions is, Holmes wrote, "perfectly logical." *Id.* "If you have no doubt of your premises or your power and want a certain result with all your heart you naturally express your wishes in law and sweep away all opposition. To allow opposition by speech seems to indicate that you think the speech impotent ... or that you do not care wholeheartedly for the result, or that you doubt either your power or your premises." *Id.* We live in a society confident of its power and its premises. Our self-confidence has not, however, led us to stifle voices of protest and discontent. Our "profound national commitment" to the principle that "debate on public issues should be uninhibited, robust, and wide open," *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964), is a testament of faith in the good sense and common decency of the American people—a belief that the people, having examined the assumptions of their society, will choose to reaffirm them.

Permitting the premises of our society to be constantly questioned means that there will always be times when people with lost causes and unfulfilled dreams disturb the serenity of our communities. We ought not to be overly troubled by the resulting clamor. It is the inevitable consequence of living in a great and restless democracy.

Affirmed.

COFFEY, Circuit Judge, dissenting.

The Majority inaccurately characterizes this case as an attempt by the Town of

Brookfield to deprive the picketers of their right to be heard: "People who care passionately about a political or social issue have a right to be heard." Majority opinion at 1352. The picketers are not being denied their right to be heard. They may advertise their grievances in any non-residential area. They can communicate their message through other media—direct mail, radio, television, newspapers or telephone. We are called upon to balance the right of the picketers to advertise their grievance against the right of innocent people (Brookfield residents) far removed from the controversy to enjoy the peace and tranquility of their home in an area zoned residential where little toddlers romp and play. Citizens also have a right to the quiet, comfort, and privacy of their own home, free from the cacophony of sounds and other disturbances which all too often penetrate and invade our lives once outside the peaceful sanctity of their domicile. The controversy before us involves the Town of Brookfield, Wisconsin's attempt to balance the right of privacy against the right of freedom of speech under circumstances that I believe reasonably justify the Town's decision to strike the balance in favor of privacy while not depriving the picketers of their right to advertise their grievance. Although this court has an obligation to protect the rights of individuals, "we must not [ever] lose sight of the common good of all mankind." *United States v. Madison*, 689 F.2d 1300, 1314 (7th Cir.1982). For every right, there is a corresponding obligation. The picketers have a right to express their concerns about abortion, but they also have an obligation to respect and honor the rights of others, especially those foreign to the controversey such as Dr. Victoria's innocent neighbors and their infant children who also have the right to enjoy the privacy, peace and tranquility of their own homes. These corresponding obligations preserve the order and organization that make the exercise of our individual rights a reality instead of an illusory promise as is true in many other countries. Ours is a government of laws, not of men, reflecting the beliefs of the Majority enacted through

their legislative bodies (Town Council) and protecting individual rights, *but* not at the expense of society as a whole. We must not lose sight of the common good of all mankind in our zealousness to protect individual rights. As the Supreme Court explained:

"Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses."

*Cox v. New Hampshire*, 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941). Because I cannot agree with the Majority that a person's right to privacy must give way to unsolicited, and disruptive conduct which not only intimidates but harasses innocent people in the privacy of their own homes, I dissent. Even though ample alternative methods of communication are available to the picketers (direct mail, radio, television, newspaper or telephone), the Majority forces the Town and its residents to tolerate this unjustified assault on the residents' right of privacy.

The right of free speech guaranteed by the First Amendment to our Constitution has always been considered as essential to our survival as a free nation. "[F]ree speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S.Ct. 209, 215–16, 13 L.Ed.2d 125 (1964). Just as the courts have recognized the fundamental importance of free speech to a free society, they have also acknowledged that the right of free speech is not absolute: "[i]t is well understood that the right of free speech is not absolute at all times and under all circumstances." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942). Justice Holmes stated: "The most stringent protection of free speech would not protect a man in falsely shouting fire in a [crowded] theater and causing a panic." *Schenck v. United States*, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919). Although freedom of

speech is fundamental, it does not mean "that everyone with opinions or beliefs to express may address a group at any public place and at any time." *Cox v. Louisiana,* 379 U.S. 536, 554, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965). The Supreme Court stated in *United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983), "[w]e have regularly rejected the assertion that people who wish 'to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.'" (quoting *Adderly v. Florida,* 385 U.S. 39, 47–48, 87 S.Ct. 242, 247–48, 17 L.Ed.2d 149 (1966)). As Justice Black noted in his concurrence to *Gregory v. City of Chicago,* 394 U.S. 111, 125, 89 S.Ct. 946, 953–54, 22 L.Ed.2d 134 (1969) (emphasis added):

"Were the authority of government so trifling as to permit anyone with a complaint to have vast power to do anything he pleased, wherever he pleased, and whenever he pleased, our customs and our habits of conduct, social, political, economic, ethical, and religious, would all be wiped out, and become no more than relics of a gone but not forgotten past. Churches would be compelled to welcome into their buildings invaders who came but to scoff and jeer; *streets and highways and public buildings would cease to be available for the purpose for which they were constructed and dedicated whenever demonstrators and picketers wanted to use them for their own purposes. And perhaps worse than all other changes, homes, the sacred retreat to which families repair for their privacy and daily way of living, would have to have their doors thrown open to all who desire to convert the occupants to new views, new morals, and a new way of life.*"

Consequently, protected expression is subject to limitation by the state under certain circumstances. *See United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20

L.Ed.2d 672 (1968). As the Supreme Court noted 46 years ago,

"[i]t is equally clear that a state may by general and non-discriminatory legislation regulate the times, places, and the manner of soliciting upon its streets, and of *holding meetings thereon;* and in other respects safeguard the peace, good, or comfort of the community, without unconstitutionally invading the liberties protected by the [First Amendment]."

*Cantwell v. Connecticut,* 310 U.S. 296, 304, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940) (emphasis added). The state's right to limit expression becomes less restricted as the form of expression moves away from pure speech to include an element of conduct (picketing). "It has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage and Ice Company,* 336 U.S. 490, 502, 69 S.Ct. 684, 691, 93 L.Ed. 834 (1949). As the Supreme Court noted in *Cox,* "[t]he examples are many of the application by this court of the principle that certain forms of conduct mixed with speech may be regulated or prohibited." 379 U.S. at 563, 85 S.Ct. at 480.

The conduct of the picketers in this case, picketing in a private residential neighborhood, although intertwined with an element of expression, has long been recognized as subject to state regulation:

"Picketing by an organized group is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated. *Hence, those aspects of picketing make it the subject of restrictive regulation.*"

*Bakery Drivers Local v. Wohl,* 315 U.S. 769, 776–77, 62 S.Ct. 816, 819–20, 86 L.Ed. 1178 (1942). Thus, although picketing contains an element of speech,[1] the

---

**1.** "[t]hat is arguments, usually on a plaque card, made to persuade other people to take the pick-

eters side of a controversy." *NLRB v. Fruit & Vegetable Packers & Warehousemen, Loc.* 760,

Supreme Court has never recognized picketing as the "inevitable legal equivalent" of speech. *Hughes v. Superior Court,* 339 U.S. 460, 465, 70 S.Ct. 718, 721, 94 L.Ed. 985 (1950). Further, the manner in which the picketing proceeds has never been considered as relevant to the state's power to regulate or prohibit picketing: "[a] state is not required to tolerate in all places and all circumstances *even* peaceful picketing by an *individual.*" *Bakery & Pastery Drivers, etc. v. Wohl,* 315 U.S. at 775, 62 S.Ct. at 819 (emphasis added).

The state's interest in regulating expressive conduct is even greater where the expressive conduct threatens to (or does) impinge on the exercise of equally important constitutional rights (privacy) of others.

> "Although American constitutional jurisprudence, in the light of the First Amendment, has been zealous to preserve access to public places for purposes of freedom of speech, *the nature of the forum and the conflicting interest involved have remained important in determining the degree of protection afforded by the Amendment to the speech in question.*"

*Lehman v. City of Shaker Heights,* 418 U.S. 298, 302–03, 94 S.Ct. 2714, 2716–17, 41 L.Ed.2d 770 (1974) (emphasis added). Thus, when evaluating a state's regulation of protected expression, we must consider:

> "The nature of a place, 'the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable.' Although a silent vigil may not duly interfere with a public library ... making a speech in the reading room almost certainly would. That same speech would be perfectly appropriate in a park. The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time."

*Grayned v. City of Rockford,* 408 U.S. 104, 118, 92 S.Ct. 2294, 2304, 33 L.Ed.2d 222 (1972) (citations omitted). In this case, as the Majority acknowledges, the right of the picketers to express their opposition to Dr. Victoria's medical practices on a public street in a residential area in Brookfield, Wisconsin clashes directly with the right of Dr. Victoria and his innocent neighbors and their infant children to retreat to the privacy of their homes, undisturbed by the "public world" that vies for their undivided attention the moment they leave the sanctity of their own property. The picketing might very well be "perfectly appropriate" at the location of Dr. Victoria's clinic, but it is clearly inappropriate in front of his private residence. The right of a person to the privacy of his or her own home is undisputed. *See Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Poe v. Ullman,* 367 U.S. 497, 551–52, 81 S.Ct. 1752, 1781–82, 6 L.Ed.2d 989 (1961) (Douglas, J., dissenting). Further, when the right of privacy clashes with the right of free expression, the interest in privacy has *not* always come out second best. Thus, in *Kovacs v. Cooper,* 336 U.S. 77, 81, 69 S.Ct. 448, 450, 93 L.Ed. 513 (1949), the Supreme Court upheld an ordinance which prohibited the use of sound trucks on residential streets. The court explained that the interest in preventing interference with the activities of residents "or the quiet they would like to enjoy" was sufficient to justify the ordinance involved. Likewise, in *Rowan v. United States Post Office Department,* 397 U.S. 728, 736, 90 S.Ct. 1484, 1490, 25 L.Ed.2d 736 (1970), the Court upheld as constitutional a federal statute that empowered the post office, upon request of an individual, to require that a sender of unsolicited mail remove the name and address of the individual from its mail lists. Thus, the individual was able to stop the delivery of unwanted information to his private residence without interfering with the mailer's general right to disseminate its materials to "willing" recipients. *See Kovacs,* 336 U.S. at 88, 69 S.Ct. at 454. The court recognized "the very basic right to be free from sights, sounds, and tangible matter" in the

377 U.S. 58, 77, 84 S.Ct. 1063, 1073, 12 L.Ed.2d

129 (1964) (Black, J., concurring).

privacy of our homes. Clearly, as Justice Black noted in his concurring opinion in *Gregory:*

> "No mandate in our Constitution leaves states and governmental units powerless to pass laws to protect the public from the kind of boisterous, threatening conduct that disturbs the tranquility of spots *selected by the people either for homes, wherein they can escape the hurly-burly of the outside business and political world,* or for public and other buildings that require peace and quiet to carry out their functions, such as courts, libraries, and hospitals."

394 U.S. at 118, 89 S.Ct. at 950. As important as free speech is to preserving our freedom, the right of privacy which ensures the opportunity for peace, tranquility, comfort, and personal solace away from the often overwhelming bombardment of unsolicited communications from political, commercial, and religious groups, enterprises, and organizations cannot be any less important in a society whose existence depends on the ability of each individual (as well as the majority) to conscientiously exercise his or her judgment in the conduct of their own affairs and those of their locality and nation. The conscientious exercise of judgment upon which we depend can hardly be exercised in the absence of the privacy necessary for contemplation and reflection. To hold that the right of free speech outweighs all other individual rights, as the Majority does in this case, goes far beyond the boundaries the Supreme Court has established when considering the limitations on the right of free speech. The Majority's unwarranted expansion of the right to freedom of speech under the First Amendment lays a foundation for transforming the right of free speech from a tool of freedom and democracy into a weapon of injustice. *See Cox v. Louisiana.*

Although the Majority acknowledges that Dr. Victoria and his neighbors have a right to privacy and recognize a need for balancing that right against the picketers' right of expression, the balancing test applied by the Majority, reflects its determination unsupported in case law that the right of free expression always supersedes the right to privacy. Is the Majority not making the same error of judgment that the civil libertarians in the 1960s made when attempting to overhaul the very foundation of our criminal law? I question whether the Majority's holding brings us closer to falling prey to the same type of unrealistic interpretation of an individual's rights as contrasted with the good of all mankind, which is primarily responsible for our present inability to adequately protect society from criminal activity. The Majority, in requiring the Town of Brookfield to substantiate that its ordinance is the least restrictive means to protect its residents' right to privacy misconstrues decisions of the United States Supreme Court, and not only imposes a greater burden on all municipalities but effectively precludes a state from protecting the rights of individuals in their homes from shouting, "noisy, marching, tramping, threatening picketers and demonstrators bent on filling the minds of men, women, and children with fears of the unknown." *Gregory,* 394 U.S. at 126, 89 S.Ct. at 954 (Black, J., concurring).

> "[S]treets and highways and public buildings would cease to be available for the purposes for which they were contructed and dedicated whenever demonstrators and picketers wanted to use them for their own purposes."

*Gregory,* 394 U.S. at 125, 89 S.Ct. at 954 (Black, J., concurring).

In so doing, the Majority makes the unwilling recipient of the message carried by the picketers a captive in his own home. As the Supreme Court stated in *Rowan:*

> "If [a] prohibition operates to impede the flow of even valid ideas, the answer is that no one has a right to press even 'good' ideas on an unwilling recipient. That we are often 'captives' outside the sanctuary of the home and subject to objectionable speech, and other sound does not mean that we must be captives everywhere."

397 U.S. at 738, 90 S.Ct. at 1491.

Further, the Majority ignores the authority of a state or municipality to enact laws

or ordinances for the protection of the public health and safety under its police powers. As the United States Supreme Court explained, that "state legislatures have constitutional authority to experiment with new techniques; they are entitled to their own standard of the public welfare; ..." *Day-Brite Lighting v. Missouri,* 342 U.S. 421, 423, 72 S.Ct. 405, 407, 96 L.Ed. 469 (1952).

> "For the legislature absolutely or conditionally to forbid public speaking *in a highway* or public park is no more an infringement of the rights of a member of the public than for the owner of a private house to forbid it in his house. When no proprietary right interferes the legislature may end the right of the public to enter upon the public place by putting an end to the dedication to public uses. So it may take the less step of limiting the public use to certain purposes."

*Davis v. Massachusetts,* 167 U.S. 43, 47, 17 S.Ct. 731, 733, 42 L.Ed. 71 (1897).

> "The power and duty of the State to take adequate steps to preserve the peace and protect the privacy, the lives, and the property of its residents cannot be doubted."

*Carlson v. California,* 310 U.S. 106, 113, 60 S.Ct. 746, 749, 84 L.Ed. 1104 (1940). Thus, I am convinced that the Framers of the Constitution would have held that the Town of Brookfield acted within its constitutional authority in enacting an appropriate content-neutral time, manner, place regulation of speech.

The analysis applied to determine the constitutionality of a challenged regulation of free expression depends on (1) the nature of the forum involved, and (2) whether the regulation is content-based. Where the forum involved falls within the class the Supreme Court has labeled "quintessential public forums,"[2] the state may enforce a content-based regulation only by showing that "its regulation is necessary to serve a

compelling state interest and that it is narrowly drawn to achieve that end." *Perry Educ. Assn. v. Perry Local Educator's Assn.,* 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). However, the states may also enforce time, place, and manner regulations of expression that are content-neutral upon a lesser showing that the regulation is "narrowly tailored to serve a significant government interest" and that it "leave[s] open ample alternative channels of communication." *Id.* The first step in analyzing a statute or ordinance that regulates expression is to determine whether *the regulation involved is a content-based or content-neutral time, manner, and place restriction.*

The Brookfield ordinance challenged in this case provides:

> Section 9.17 Residential Picketing.
> "... (2) PICKETING RESIDENCE OR DWELLING UNLAWFUL. It is unlawful for any person to engage in picketing before or about the residence or dwelling of any individual in the Town of Brookfield."

The ordinance is not selectively drafted and prohibits all picketing "before or about the residence or dwelling of any individual," regardless of the purpose of the picketing. The ordinance does not prescribe expression on the basis of the message contained in the expression, but rather proscribes a specific mode of expression (picketing), in a particular locality—a residential area. Therefore, the Brookfield ordinance is a content-neutral time, manner, and place regulation, and meets the test of constitutional validity if it serves a significant state interest, is narrowly tailored to meet that interest, and leaves open ample alternative channels of communication.

The Town of Brookfield set out in the declaration of purpose two interests among others that the picketing ordinance was intended to serve: (1) protecting the privacy interests of its residents, and (2) the town's interest in *protecting the safety of*

---

**2.** "Places which by long tradition or by government fiat have been devoted to assembly and

*debate." Perry,* 460 U.S. at 45, 103 S.Ct. at 955.

those using its streets and sidewalks by regulating vehicular and pedestrian traffic. The Supreme Court has long recognized the legitimacy of the state's interest in regulating expressive conduct that interferes with the orderly use of public streets:

> "Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses. The authority of a *municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend.... Where a restriction of the use of highways in that relation is designed to promote the public convenience in the interest of all, it cannot be disregarded by the attempted exercise of some civil right which in other circumstances would be entitled to protection.* One would not be justified in ignoring the familiar red traffic light because he thought it his religious duty to disobey the municipal command or sought by that means to direct public attention to an announcement of his opinions."

*Cox v. New Hampshire,* 312 U.S. at 574, 61 S.Ct. at 765 (emphasis added). *See also Kunz v. New York,* 340 U.S. 290, 293–94, 71 S.Ct. 312, 314–15, 95 L.Ed. 280 (1951).

> "The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. *A restriction [e.g., a ban on picketing in residential areas] in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection.* Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly. *Governmental authorities have the duty and responsibility to keep their streets open and available for movement.* A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations."

*Cox v. Louisiana,* 379 U.S. at 554, 85 S.Ct. at 464 (emphasis added). *See also United States Labor Party v. Oremus,* 619 F.2d 683, 688 (7th Cir.1980) (Illinois statute which prohibited persons from standing on a "highway for purposes of soliciting employment, business or contributions from the occupant of any vehicle" is a "permissible regulation"); *ACORN v. City of Phoenix,* 603 F.Supp. 869, 871 (D.C.Ariz.1985) (holding unconstitutional an ordinance that prohibited "tagging" of cars on roadways because highway or roadway intersections *"are not designated forums for public communication while in use by vehicular traffic")* (emphasis added). The street in front of Dr. Victoria's home was intended for vehicular traffic and not as a forum for public communication. Although "highway" has a broad meaning (basically including any street, city or rural), the purposes of a highway, as used in the statutory definition, are limited. In defining highway, the statute refers to "every way open to the use of the public as a matter of right for the *purposes of vehicular travel.* It includes those roads ... opened to the use of the public for the *purpose of vehicular travel."* Wis.Stat. § 340.01(22) (emphasis added). Thus it is clear that the purpose envisioned by the Wisconsin legislature—vehicular travel—would be inherently incompatible with pedestrians' picketing, and the use of the street for picketing as a matter of right is lost. The record here reveals that there were no sidewalks along the streets affronting Dr. Victoria's residence and that the streets were but a mere thirty feet wide. Obviously any picketing conducted in front of private residences in Brookfield would be confined to

those narrow streets where it obviously will disrupt and impede the purpose for which the land was dedicated—the free flow and movement of vehicular traffic. More importantly, the traffic on these roads poses a threat to the safety of pedestrians, including the picketers, especially young children, senior citizens and others who might be forced to walk further out onto the road in order that they might get around the picketers congregated, shouting and chanting in front of Dr. Victoria's residence. The danger to pedestrians on these narrow roads in front of and about Dr. Victoria's home becomes even greater when cars are parked on the streets, as they were during the picketing involved here, leaving less space for the movement of traffic.[3] The distraction of the driver's attention caused by the marching and chanting of the picketers and the narrowness of the streets certainly presents a safety hazard the Town of Brookfield is obligated to prevent. As we noted in *Oremus* where "the concern of the State is the evident dangers of physical injury and traffic disruption that are present when individuals stand in the center of busy streets trying to engage drivers and solicit contributions.... [t]his legislatively expressed concern outweighs" the solicitors' First Amendment interests. 619 F.2d at 688. The danger to picketers congregated in the street in front of Dr. Victoria's home was no less than the danger to the solicitors in *Oremus*. This danger increases where, as in this case, the picketers do not limit their picketing to daytime, since at sunset visibility is reduced and thus driving is more difficult.[4] The State of Wisconsin has recognized the danger to pedestrians using the streets and has imposed a duty on such persons: "No person shall stand or loiter on any roadway other than in a safety zone if such act interferes with the lawful move-ment of traffic." Wis.Stat. § 346.29(2) (Standing or loitering in highway prohibited). The Wisconsin Supreme court has stated:

> "This court has, in a number of cases, held that a pedestrian, crossing a highway at other than a crosswalk, is, as a matter of law, at least 50 percent negligent in the event he is struck by a motor vehicle during the crossing. However, these cases cite and rely upon the right-of-way statute, imposing on a non-crosswalk pedestrian on a highway an absolute duty to yield the right-of-way.... [Persons voluntarily on a street] are required to maintain a lookout and are negligent for placing themselves in such position of danger to their own safety.... [Playing on the street] adds an additional element [to the duty of care imposed on person walking across street]: using a highway for a purpose for which it was not intended, and placing oneself in a position of danger while so doing."

*Wicker v. Hadler*, 58 Wis.2d 173, 179, 205 N.W.2d 770 (1973). Wisconsin Statute § 941.03 makes it a felony to interfere with the orderly flow of traffic on a street:

> "941.03 HIGHWAY OBSTRUCTION
>
> (1) Whoever creates an unreasonable risk and high probability of causing death or great bodily harm to another by intentionally placing an obstacle in or upon a highway, damaging a highway, removing or tampering with a sign or signal used for the guidance of vehicles, giving a false traffic signal, *or otherwise interfering with the orderly flow of traffic and realizes that he or she thereby created such risk and probability is guilty of a Class A felony.*"

(emphasis added). Highway is defined for purposes of the criminal code as:

---

**3.** The record reveals that the picketers sometimes came to Dr. Victoria's home on buses which were parked on the street. Assuming the width of a bus is approximately seven feet, buses parked on both sides of the street would not only greatly effect the visibility of drivers and pedestrians, but would leave less than six-teen feet for traffic movement (and even less in the winter).

**4.** The record establishes that on several occasions, the picketing lasted until 8:30 p.m. In April the picketing was conducted after darkness had descended on the area.

"any public way or thoroughfare, including bridges thereon, any roadways commonly used for vehicular traffic, whether public or private, ..."

The statute clearly covers all streets including streets in residential neighborhoods, e.g., the street in front of Dr. Victoria's home. Thus, unless this court is prepared to hold § 941.03 of the Wisconsin Statutes unenforceable for being unconstitutional, I fail to understand how the Majority can hold the Brookfield picketing ordinance unconstitutional.

A number of picketers on a street pose a much greater danger than a person merely crossing the street. The continued presence of a picketer on a street designed and maintained exclusively for vehicular travel makes him a stationary target for any driver distracted by the picketing activity. If we allow picketing on streets and highways, the danger to the picketers and pedestrians would be even greater during the winter months, when snowbanks along the streets protrude onto the streets making them even more narrow and thus providing even less space for the free movement of vehicular traffic, pedestrians. Picketing on streets would cause the Town a myriad of problems. The Town would be subject to liability if it failed to adequately protect those using the streets from the increased hazards posed by the picketing activities. In order to adequately protect the pedestrians and the picketers, the Town at the expense of its taxpayers would in all probability be required to provide police protection to supervise and direct traffic and pedestrian flow around the area whenever any group decided to picket in a residential area. Since the picketers are not required to give notice of their plans to picket, the Town would have no way to plan efficiently for the staffing of officers needed to supervise the demonstration, and thus a demonstration could leave the town underprotected by tying up the on-duty police force. Furthermore, this would, in effect, place the Town of Brookfield and its residents in the position of subsidizing the protest activ-

ities of any group that selected a private residence as the target for a demonstration. Further, it is inconceivable that the First Amendment requires taxpayers to bear the extra costs associated with unlawful picketing [5] in private residential neighborhoods where they have ample and more appropriate alternative forums for advertising their grievances such as direct mail, radio, television, newspapers or telephoning as is common practice in political campaigns. As I discuss *infra*, there are reasonable and more appropriate places for the picketers here to conduct their protests—any area other than private residential neighborhoods or at the place where Dr. Victoria performs the surgical procedures.

Although protecting the privacy interests of its residents was one motivation for the Town's ordinance, the Majority disregards the other interest the Town set out in the declaration of policy, that of regulating traffic, simply because the town did not introduce evidence in this case that the abortion-picketing had disrupted traffic. Picketing in the street obviously would disrupt the flow of traffic. The fact that there was no evidence of traffic disruption presented in this case does not negate the legitimacy or significance of the justification proffered for the ordinance. The ordinance bans all picketing "before or about the residence or dwelling of any individual," not just the picketing that the appellees seek to conduct. And thus the Majority unjustifiably assumes that because some picketing might not have implicated the Town's interest in protecting the safety of those using the streets, no picketing ever will. As this court noted in *Oremus:*

> "Plaintiffs also argue that the [State] could serve [its] interest through a less restrictive means by punishing only those who actually disrupt traffic or engage in unsafe behavior. *The state need not wait for personal injuries.*"

619 F.2d at 688 n. 4 (emphasis added). We do not require municipalities to wait until a building is engulfed in flames be-

**5.** See Wis.Stat. § 340.01(22), *supra* at 44.

fore allowing the city to enact and enforce fire codes. We do not require the deaths of thousands in air traffic accidents before we regulate air travel. I fail to understand why the Town of Brookfield must wait until someone is injured, and seeks to recover damages from the Town or hold the Town liable, before it acts to protect those using its streets in an unlawful manner. *See* Wis.Stat. § 340.01(22).

Thus, I see no logical or legal basis to accept the Majority's assertion that the town's interest in regulating traffic in residential areas adds no weight to the town's justification for the ordinance. Picketing in a street interferes with the free movement of vehicular traffic and endangers citizens using the streets for lawful purposes (crossing the street at a crosswalk). Clearly, protecting the safety of its residents and others using its streets is a legitimate exercise of the Town's police power reserved to it by the Constitution.

> "A restriction [e.g., a ban on picketing in residential areas] in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection. Governmental authorities have the duty and responsibility to keep their streets open and available for movement."

*Cox,* 379 U.S. at 554, 85 S.Ct. at 464.

Furthermore, it is a basic principle of tort law that a town that neglects to prevent foreseeable injuries in public areas can be held liable for its negligence. The examples of this are too obvious to recount. The danger to people using the streets lawfully while the picketers are demonstrating is so obvious that I do not comprehend how the Majority can cavalierly brush it aside stating that the Town's interest in regulating traffic "constituted only a minor part of the Town's interest in the ordinance." Majority op. at 1350. When the interest in traffic regulation is combined with the Town's interest in protecting the privacy of its residents as set forth in the

declaration of policy, the Town's justification for the ordinance is more than "significant," it is substantial and compelling.

The Supreme Court has previously acknowledged that in the privacy of the home, "the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder." *F.C.C. v. Pacifica Foundation,* 438 U.S. 726, 748, 98 S.Ct. 3026, 3040, 57 L.Ed.2d 1073 (1978). Indeed, almost 40 years ago, in 1949, the Supreme Court recognized the legitimate interest of the state in regulating expression so as to protect the privacy interest of its citizens in their homes. *Kovacs v. Cooper* (prohibition of sound trucks in residential neighborhoods). And in the years since the *Kovacs* decision, the Supreme Court has consistently held that where the privacy interest is substantial, the right to free expression may have to give way. As the Supreme Court pointed out in *Grayned,* when evaluating a time, manner, and place regulation "the crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." 408 U.S. at 118, 92 S.Ct. at 2304. Accordingly,

> "consideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved."

*Heffron v. International Society for Krishna Consciousness,* 452 U.S. 640, 651–52, 101 S.Ct. 2559, 2565–66, 69 L.Ed.2d 298 (1981). *See also Bering v. Share,* 106 Wash.2d 212, 721 P.2d 918 (1986). Indeed, the Town of Brookfield determined—and I agree with its well-reasoned conclusion—that picketing was incompatible with the normal activity of a private residential neighborhood.

> "The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time."

*Grayned,* 408 U.S. at 118, 92 S.Ct. at 2304. Unless this court can hold as a matter of law that picketing *is* compatible with the

*normal* activity usually carried on in a residential neighborhood, it is not the function of this court or any other court to substitute its judgment for the careful and considered judgment of the Brookfield Town Council. *Clark v. CCNV*, 468 U.S. 288, 104 S.Ct. 3065, 3072, 82 L.Ed.2d 221 (1984).

> "We do not believe, however, that either *United States v. O'Brien,* or the time, place, and manner decisions *assign to the judiciary* the authority to replace the Park Service as the manager of the nation's parks...."

(emphasis added). To do so is to ignore the municipality's own right of governance. In order to fit its analysis into the *Perry* test for time, manner, and place regulations the Majority is forced to assert both that picketing is compatible with the normal activities of a residential neighborhood *and* that ample alternative channels are not available to the picketers because "the disturbance occasioned by the residential picketing in this case is actually one measure of its unique value...." Majority op. at 1348. The Majority ignores the incompatibility of picketing with a residential area and ingeniously states:

> "The fact that the message may reach and disturb families and children is clearly part of the point of the picketing, for, to a certain extent, the picketers seek to communicate their concerns about a perceived assault on the family and on childhood itself. There can be no better place to convey those concerns than in a residential area."

Majority op. at 1348. The Majority incorrectly assumes that prohibiting the picketers from demonstrating in front of Dr. Victoria's home denies the picketers access to his neighbors. But this is totally unfounded because nothing in the ordinance precludes the picketers from reaching Dr. Victoria's neighbors through use of advertising through the media of direct mail, radio, television, newspaper or telephone. Each of these alternative methods allows Dr. Victoria's neighbors to "turn off" the message and protect their privacy should they choose to do so, and thus is in accord with the safeguards of privacy enumerated in the decisions of the United States Supreme Court. *See Pacifica; Rowan; Kovacs. See also,* 39 U.S.C. § 4009 (Prohibition of pandering advertisements in the mails).

Furthermore, contrary to the Majority's assertion, I fail to see any connection between the picketer's message that abortion is wrong that would make anti-abortion picketing compatible with the neighborhood wherein a doctor who performs abortions happens to reside. There is no evidence in the record that Dr. Victoria performed abortions at his home or provided any abortion-related service in his home, much less ever received phone calls concerning his abortion practice since his home phone is unlisted. Whom did the picketers intend the message to reach? If they intended to dissuade others from obtaining abortions by advertising the same through picketing, they were in the wrong place for their activity would have more impact at one of the clinics in the immediate area where those intending to receive an abortion would visit to have the vacuum or surgical procedure performed and where the pedestrian and vehicular traffic is much greater. If it was their intention to persuade Dr. Victoria's neighbors that abortion was wrong, as the Majority suggests, the ordinance does not prevent their access to his neighbors since direct mail, radio, television, newspapers, and telephones all provide the picketers with the same access to Dr. Victoria's neighbors that any political campaign has. If they intended to embarrass, harass and intimidate the doctor and embarrass him by annoying his neighbors, then certainly the right of free expression in this case does not counterbalance the well-recognized right of an individual to the privacy of his own home, "sometimes the last citadel of the tired, the weary, and the sick." *Gregory,* 394 U.S. at 125, 89 S.Ct. at 954. (Black, J., concurring). I do not agree with the Majority's holding that in effect interprets the First Amendment to include the right to harass or intimidate others.

Another major flaw in the Majority's analysis of the compatibility issue is that the Majority conveniently avoids addressing the central question. The central question is *not*, as the Majority seems to believe, whether the message the picketers seek to convey is compatible with the residential area the ordinance covers, but rather, as the Supreme Court enunciated, whether *"the manner* of expression" is basically incompatible with "the *normal* activity of a particular place at a particular time." *Grayned*, 408 U.S. at 118, 92 S.Ct. at 2304 (emphasis added). The Majority admits that the conduct of the picketers in front of private residences disrupts the neighborhood wherein it occurs. As the United States Supreme Court decisions make clear, an individual's residence, and the neighborhood surrounding that residence, is a place for quiet repose; family tranquility; an "island of solace" away from the "hustle and bustle" of public activity. See *Pacifica, Kovacs, Rowan. Cf. Cohen v. California*, 403 U.S. 15, 21, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971) ("... this Court has recognized that government may properly act in many situations to prohibit intrusion into the privacy of the home of unwelcome views and ideas which can never be considered as being totally banned from the public dialog ..."). In *Kovacs*, the Court stated:

> "The right of free speech is guaranteed every citizen that he may reach the minds of willing listeners and to do so there must be opportunity to win their attention. This is the phase of freedom of speech that is involved here. We do not think the Trenton ordinance abridges that freedom. It is an extravagant extension of due process to say that because of it a city cannot forbid talking on the streets through a loud speaker in a loud and raucous tone. Surely such an ordinance does not violate our people's

> 'concept of ordered liberty' so as to require federal intervention to protect a citizen from the actions of his own local government. Opportunity to gain the public's ears by objectionably amplified sound on the streets is *no more assured by the right of free speech than is the unlimited opportunity to address gatherings on the streets. The preferred position of freedom of speech in a society that cherishes liberty for all does not require legislators to be insensible to claims by citizens to comfort and convenience. To enforce freedom of speech in disregard of the rights of others would be harsh and arbitrary in itself.* That more people may be more easily and cheaply reached by sound trucks, perhaps borrowed without cost from some zealous supporter, is not enough to call forth constitutional protection for what those charged with public welfare reasonably think is a nuisance when easy means of publicity are open. Section 4 of the ordinance bars sound trucks from broadcasting in a loud and raucous manner on the streets. *There is no restriction upon the communication of ideas or discussion of issues by the human voice, by newspapers, by pamphlets, by dodgers."*

336 U.S. at 88–89, 69 S.Ct. at 454–55 (emphasis added). The presence of picketers lurking outside one's home, threatening the very peace and tranquility and security that constitutes a most significant part of the right to privacy, can never be considered as being compatible with the normal activities of a private residential neighborhood. *See Pacifica; Rowan.* The frightening of small children, as occurred during the prior demonstrations in front of Dr. Victoria's home by these picketers, can never be accepted much less tolerated as part of the normal activity that occurs in a residential neighborhood.[6] Despite the ob-

6. During the April 20, 1985 picketing of Dr. Victoria's home, one of the picketers told a five-year old neighbor boy that "there is a man up the road who kills babies." The child became upset and would not leave the house the rest of the day. For over one week, the child would not even visit his little friend's house because his friend lived two houses away from the "man who kills babies." Another neighbor of Dr. Victoria related that while walking in the area where the picketing occurred with his six-year old daughter, picketers approached and

vious incompatibility of the picketing with the residential areas of the Town of Brookfield, the Majority cavalierly concludes that the Town's interest in protecting its residents from the "noisy, marching, tramping, threatening picketers and demonstrators bent on filling the minds of men, women, and children with fears of the unknown," *Gregory*, 394 U.S. at 126, 89 S.Ct. at (Black, J., concurring), can never be sufficient to justify the limited restraint on free expression imposed by the Brookfield ordinance.

Clearly the Framers of the Constitution never intended the right of free speech as a weapon of harassment or intimidation of individuals in the very privacy of their own dwellings. Thus, the Town of Brookfield's picketing ordinance was justified by compelling state interests: protecting the right of privacy of residents in their own homes and regulating vehicular and pedestrian traffic on narrow streets without sidewalks.

Having enacted the ordinance to serve substantial and compelling interests, the Town of Brookfield is entitled to enforce the ordinance as long as it is "narrowly tailored" to serve those interests and as long as "ample alternative channels of communication" are made available to picketers. Since the ordinance is narrowly tailored and circumscribed and ample alternatives remain for the picketers to convey their message, I would hold the ordinance constitutional under the *Perry* criteria.

Contrary to the assertion of the Majority that in order for the town to establish that its ordinance is "narrowly tailored," it must "demonstrate that its objectives will not be served by means less restrictive of First Amendment Freedoms," Majority opinion at 1349–50, the town need only establish that its content-neutral regulation of expression "responds precisely to the substantive problems which legitimately concern the [town]." *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct.

2118, 2132, 80 L.Ed.2d 772 (1984). The Majority derives its "less restrictive" alternative requirement from this court's ingenious interpretation of the *Perry* time, manner, and place test in *City of Watseka v. Illinois Public Action Council*, 796 F.2d 1547 (7th Cir.1986). In *Watseka*, the Majority incorrectly read into the "narrowly tailored" prong of the *Perry* test a requirement that the government, when arguing the constitutional validity of a statute or ordinance that impinges on free expression, must establish that "less restrictive alternatives are inadequate to protect the governmental interest." 796 F.2d at 1554. The Majority somehow condescendingly cast aside my argument that cases decided after *Perry* made clear that the "less restrictive" alternative requirement was *not* part of the test for content-*neutral* time, manner, and place regulations. *See Watseka*, 796 F.2d at 1561–67 (Coffey, J., dissenting). In *Clark v. CCNV*, the Supreme Court emphatically rejected the "less restrictive" alternative that the District of Columbia Circuit had read into the content-neutral time, manner, and place test:

> *"We are unmoved by the Court of Appeals' view that the challenged regulation is unnecessary, and hence invalid, as there are less speech-restrictive alternatives that could have satisfied the government's interest in preserving park lands.* There is no gainsaying that preventing overnight sleeping will avoid a measure of actual or threatened damage to Lafayette Park Mall. *The Court of Appeals' suggestions that the Park Service minimize the possible injury by reducing the size, duration, or frequency of demonstrations would still curtail the total allowable expression in which demonstrators could engage, whether by sleeping or otherwise, and these suggestions represent no more than a disagreement with the Park Service over how much protection the core*

made comments, in the presence of the child, to the effect that Dr. Victoria was killing their children. I am at a loss to understand how the Majority can condone such conduct—as it clear-

ly does by stating that "the disturbance [of families and children] occasioned by the residential picketing in this case is actually one measure of its unique value...." Majority op. at 1348.

parks require or how an acceptable level of preservation is to be attained. We do not believe, however, that either *United States v. O'Brien, or the time, place, and manner decisions assign to the judiciary the authority to replace the Park Service as the manager of the nation's parks or endow the judiciary with the competence to judge how much protection of park lands is wise and how that level of conservation is to be attained.*"

104 S.Ct. at 3072 (emphasis added).

Despite this unequivocal rejection of the "less restrictive alternative" requirement, the Majority in *Watseka* insisted on reading the requirement into the *Perry* test explaining:

"We do not believe that Justice White's opinion in *Clark* rejected the less restrictive means analysis. *See* 468 U.S. at 298, 104 S.Ct. 3071. Although the opinion rejects the lower court's less-restrictive means holding, we read Justice White to say that the alternatives were not adequate. Although Justice White has elsewhere expressed his disapproval of the less-restrictive-means standard, *see Regan v. Time*, 468 U.S. [641] at 655–57, 104 S.Ct. [3262] at 3271 [82 L.Ed.2d 487 (1984)], that view has never attracted a majority of the Court. *See also Kenosha*, 767 F.2d at 1255 n. 4"

796 F.2d at 1554 n. 13. The Supreme Court cases decided after *Clark* make it even more clear, definite and certain that the "less restrictive" alternative requirement is not part of the time, manner, and place test. In *United States v. Albertini*, 472 U.S. 675, 105 S.Ct. 2897, 2907, 86 L.Ed.2d 536 (1985) (emphasis added), the Court stated:

"[T]he First Amendment does not bar application of a neutral regulation that incidentally burdens speech merely because a party contends that allowing an exception in the particular case will not threaten important government interests. See *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 295–96, 104 S.Ct. 3065, 3070, 82 L.Ed.2d 221 (1984)

("the validity of this regulation need not be judged solely by reference to the demonstration at hand"). Regulations that burden speech incidentally or control the time, place, and manner of expression, see *id.*, at 297–98, and n. 8, 104 S.Ct., at 3071, and n. 8, must be evaluated in terms of their general effect. *Nor are such regulations invalid simply because there is some imaginable alternative that might be less burdensome on speech. Id.* at 299–300, 104 S.Ct., at 3072. *Instead, an incidental burden on speech is no greater than is essential, and therefore is permissible under O'Brien, so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.* Cf. *id.*, at 297–98, 104 S.Ct., at 3071 ("if the parks would be more exposed to harm without the sleeping prohibition than with it, the ban is safe from invalidation under the First Amendment.") *The validity of such regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests. Id.*, at 299–300, 104 S.Ct., at 3072."

In *City of Renton v. Playtime Theaters, Inc.*, —— U.S. ——, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986) (emphasis added), the Court explained:

"*On the other hand, so-called 'content-neutral' time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication.* See *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293–94, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984); *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 807, 104 S.Ct. 2118, 2130, 80 L.Ed.2d 772 (1984); *Heffron v. International Society for Kirshna Consciousness, Inc.*, 452 U.S. 640, 647, 648, 101 S.Ct. 2559, 2563, 2564, 69 L.Ed.2d 298 (1981)."

This measure of constitutional validity is not an inflexible standard. In *Clark v. CCNV*, 468 U.S. 288, 104 S.Ct. 3065, 3071, 82 L.Ed.2d 221 (1984), the Supreme Court held that the fact that a more carefully drafted regulation banning sleeping in parks in the District of Columbia could have accomplished the purposes of the Park's Services "more effectively or less clumsily" than the regulation enacted, did not make the regulation constitutionally infirm. Thus, even though the protection of the government's interest involved in *Clark* was "imperfect," the absence of perfection did not negate the value of the regulation in achieving the government's purpose.

These cases make it clear that the "less restrictive" alternative requirement is not part of the time, manner, and place test where the regulation involved is content-neutral. I fail to understand how the Majority can defiantly persist in reading that gratuitous requirement into the test in view of the clearly expressed directives from the Supreme Court of the Land that the government need not establish that a content-neutral regulation of expression is the least restrictive means to accomplish a legitimate government objective.

Thus, if the interest of the particular governing body, state or municipality in enacting laws or ordinances which limits expression is significant, the regulation is constitutionally valid if it effectuates that interest even imperfectly, and our courts should not second guess the legislatures as to the efficiency or adequacy of the means ultimately chosen by the state:

> "... 'content-neutral' time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication."

*Renton,* 106 S.Ct. at 928.

The Majority, in striking down the Brookfield ordinance because, in its view, there are less restrictive alternatives "available to the town to address its legitimate concerns" not only imposes and mandates a burden on the town greater than that required by the Supreme Court, but substitutes its own judgment as to how best to protect the privacy interests of Dr. Victoria and his innocent neighbors and citizens for that of the Brookfield Town Council. "The validity of such regulations does not touch on a judge's agreement with the responsible decision-maker concerning the most appropriate method for promoting significant government interests." *Albertini,* 105 S.Ct. 2907. It is not the function of this court to second-guess the legislative bodies of states in enacting statutes and ordinances, since they are more attuned to the problems of their locale and thus are in a far better position to make this determination than is this court.

Finally, the Majority incorrectly concludes that a ban on picketing in residential areas is unconstitutional because it does not provide ample alternative channels of communication. The Majority claims that forcing these picketers "to picket in non-residential areas would be, in effect, to force them to engage in an entirely different form of expressive activity." Majority opinion at 1348. This overly-narrow reading of the ample alternative prong of the time, manner, and place test contravenes the very concept of time, manner, and place restrictions on free expression. The concept of time, manner and place regulations of free speech recognizes that not every form of speech is compatible with the location where the speaker may want to convey his message. The issue in analyzing the constitutionality of a content-neutral time, manner and place regulation is whether the regulation denies the speaker access to listeners that but for the ordinance could be reached by the speaker. But there is

> "no restriction upon the communication of ideas or discussion of issues by the human voice, by newspapers, by pamphlets, by dodgers."

*Kovacs,* 336 U.S. at 89, 69 S.Ct. at 454. The Brookfield ordinance does not deny the picketers access to Dr. Victoria's neighbors through alternative means of communication (direct mail, radio, television, newspa-

pers and telephones); rather it merely provides his neighbors the opportunity to turn off the picketer's message and enjoy the privacy of their own homes. The Majority has taken it upon itself to rewrite the decisions of the United States Supreme Court on time, manner and place exception to the First Amendment to include a right to make unwilling listeners captives in their own homes. This is contrary to case law and logic and effectively undermines any attempt by the state or municipality to regulate any form of expressive conduct.[7]

The Majority does not stop at rewriting the exception for time, manner, and place restrictions. It goes on to speculate that the "quality of the means of expression" used by the picketers would be adversely affected by the ordinance because "consigned to the 'safe' and busy area around Bluemound Rd., they may be conveniently ignored by passersby. They may be written off as excentric and irrelevant nuisances." I am at a loss to understand how anyone can "conveniently ignore" 30–40 people parading up and down a sidewalk chanting and carrying placards. Even so, the Majority concludes that because residential picketing does not permit "the citizens to ignore or trivialize the message picketers wish to communicate," the town cannot prohibit picketing on residential streets. In other words, the Majority has determined that the residents of Brookfield, Wisconsin, and every other suburban or residential area must listen to the message of picketers and each and every other group that decides to communicate its message by lurking about the private homes of those residents infringing upon the use and enjoyment of their homes. Brookfield's residents, contrary to the Supreme Court's statement that "no one has a right to press even good ideas on an unwilling recipient,"

are made captives in their own homes. *Rowan*, 397 U.S. at 738, 90 S.Ct. at 1491. Any group or organization can now make people captive in their own homes in any residential neighborhood. In so doing, the Majority has demonstrated a complete disregard for the absence of any alternatives to Dr. Victoria and his neighbors to protect their right of privacy. It is Dr. Victoria, his neighbors and their infant children who do not have an adequate (equivalent quality) alternative for the exercise of their constitutional right to privacy in their own home; the picketers have several alternative methods that would effectively allow them to communicate their message without infringing on the constitutional rights of others. The ordinance does not preclude the picketers from conveying their message. The picketers should limit their picketing activity to the clinics where Dr. Victoria performs abortions or any areas other than those zoned residential.[8] The Majority concludes, however, that because people are free to ignore the picketers in the alternative forums available, such forums do not provide an adequate alternative to the residential streets covered by the Brookfield ordinance. "Forcing [the picketers] to picket in non-residential areas would be, in effect, to force them to engage in an entirely different form of expressive activity." Majority opinion at 1348. There is no support in the Constitution for the Majority's position which forces unwilling listeners to give up their right of privacy in their dwellings and become the captive audience of any group or organization with a message to communicate.

I fail to understand how the Majority can speculate simply on the basis of the fact that people may be able to ignore the picketers in non-residential areas that the

---

7. *See Taxpayers for Vincent.* Indeed, none of the regulations upheld by the Supreme Court would be constitutionally valid under this approach.

8. The fact that picketing the abortion clinics might interfere with other activities of the anti-abortion group responsible for the picketing (e.g., disrupt sidewalk counseling) does not entitle the picketers to violate the privacy rights of

Dr. Victoria and his neighbors. It is the anti-abortion group itself that has foreclosed this alternative means of communicating its message, not the Town of Brookfield. The Majority forces the residents of Brookfield to endure invasions of the residents' privacy merely because the anti-abortion group has chosen conflicting methods to communicate its message.

Brookfield ordinance failed to provide ample alternative channels of communication through which the picketers can convey their message. If we stretch the limits of the First Amendment, as the Majority has, to provide the picketers with the right to picket Dr. Victoria's house, do they also have the right to follow Dr. Victoria around, posting picketers outside of every place he enters to embarrass Dr. Victoria, his family, his friends: Outside his church or synagogue so as to interfere with other worshipers? Outside his relatives' homes? Outside the homes of his friends? Outside his children's school? The Majority's holding expands the rights of the picketers at the expense of the rights of the majority of Brookfield's residents that are reflected in its passage of this ordinance. The Majority assumes, contrary to the explicit mandate of the United States Supreme Court, that the right to free speech includes the right to force unwilling people to listen. *See Cox v. Louisiana; Rowan v. United States Post Office Dept.* The Majority's contention undermines the required balancing of conflicting constitutional rights that the Supreme Court has required in cases such as this where the exercise of free speech interferes with the exercise of another constitutional right by others. *See Cantwell.* The disregarding of countervailing constitutional rights is especially intolerable where the right of privacy is involved. For the first time in almost 200 years since the drafting of our Constitution, the Majority has decided that the right of free speech is always more important than any other individual right guaranteed by the Constitution in direct contradiction to what the Supreme Court stated in *Pacifica:* in the privacy of the home, "the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder." 438 U.S. at 748, 98 S.Ct. at 3040. Thus, the Majority erroneously, as pointed out earlier, concludes that no ample alternative to residential picketing exists through which the picketers in this case can communicate their message since in no

other available forum could the picketers force their message on an unwilling captive audience. I cannot agree with the Majority's unwarranted expansion of the First Amendment right of free speech to include the privilege of forcing others to receive any message that a group, organization, or individual desires to communicate.

Furthermore, the Majority fails to recognize that ample alternative methods of communicating the picketers' message in residential areas of Brookfield exist. The picketers could direct mail literature to each of Dr. Victoria's neighbors stating their views on abortion and informing Victoria's neighbors of the doctor's activities. The picketers could advertise on the radio or on television, in newspapers or by using the telephone and communicate their views through those media. If the picketers need to demonstrate in Brookfield, let it be in the commercial areas of the Town, where their message could reach more people with less infringement on the rights of others. Each of these alternatives allows as the Supreme Court requires, the listener the freedom to turn off the message at any time; each allows the listener to protect his own privacy and does not allow protesters to make captives of unwilling listeners. Thus, contrary to the assertion of the Majority, ample alternatives exist through which the picketers can communicate their message of dissent as effectively as they can by picketing Dr. Victoria's private home and which do not infringe upon the rights of privacy of others in their homes and completely foreign to the controversy. The Majority ignores the rights of others to disregard messages they choose not to hear. *See Rowan.*

Therefore, because the Majority has unreasonably expanded the right of free expression beyond the limits established by the Supreme Court, and has done so at the expense of an equally valuable and important right, the right of privacy in one's own home, I dissent. The residents of the Town of Brookfield through their Town Council

have a right to decide what they will or will not hear. The Supreme Court explained:

> "Where a restriction of the use of highways in that relation is designed to promote the public convenience in the interest of all, *it cannot be disregarded by the attempted exercise of some civil right which in other circumstances would be entitled to protection.* One would not be justified in ignoring the familiar red traffic light because he thought it his religious duty to disobey the municipal command or sought by that means to direct public attention to an announcement of his opinions."

*Cox,* 312 U.S. at 574, 61 S.Ct. at 765 (emphasis added). The Town of Brookfield was entitled to exercise its police power to protect the comfort and convenience of its residents:

> "The police power of a state extends beyond health, morals and safety, and comprehends the duty, within constitutional limitations, to protect the well-being and tranquility of a community."

*Kovacs,* 336 U.S. at 83, 69 S.Ct. at 451.

The Majority in its opinion has underwritten the right of any group or organization to disrupt tranquillity and privacy that we have come to associate with our homes.

> "To enforce freedom of speech in disregard of the rights of others would be harsh and arbitrary in itself."

*Kovacs,* 336 U.S. at 88, 69 S.Ct. at 454. As the Supreme Court of Wisconsin noted over 15 years ago:

> "To those inside ... the house becomes something less than a home when and while the picketing ... continue[s] with..... [T]he tensions and pressures may be psychological, not physical, but they are not for that reason less inimical to family privacy and truly domestic tranquillity."

*Wauwatosa v. King,* 49 Wis.2d 398, 411–12, 182 N.W.2d 530, 537 (1971) (quoted by Rehnquist, J., dissenting in *Carey v. Brown,* 447 U.S. at 478, 100 S.Ct. at 2299).